[S. F. No. 22580.   In Bank.   July 11, 1968.]

PACIFIC GAS AND ELECTRIC COMPANY, Plaintiff and Respondent, v. G. W. THOMAS DRAYAGE & RIGGING COMPANY, INC., Defendant and Appellant.

34

Miller, Van Dorn, Hughes & O'Connor, Richard H. McConnell and Daniel C. Miller for Defendant and Appellant.

Richard H. Peterson, Gilbert L. Harrick and Donald Mitchell for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendant appeals from a judgment for plaintiff in an action for damages for injury to property under an indemnity clause of a contract.

In 1960 defendant entered into a contract with plaintiff to furnish the labor and equipment necessary to remove and replace the upper metal cover of plaintiff's steam turbine. Defendant agreed to perform the work "at [its] own risk and expense" and to "indemnify" plaintiff "against all loss, damage, expense and liability resulting from . . . injury to property, arising out of or in any way connected with the performance of this contract." Defendant also agreed to procure not less than $50,000 insurance to cover liability for injury to property. Plaintiff was to be an additional named insured, but the policy was to contain a cross-liability clause extending the coverage to plaintiff's property.

During the work the cover fell and injured the exposed rotor of the turbine. Plaintiff brought this action to recover $25,144.51, the amount it subsequently spent on repairs. During the trial it dismissed a count based on negligence and thereafter secured judgment on the theory that the indemnity provision covered injury to all property regardless of ownership.

Defendant offered to prove by admissions of plaintiff's agents, by defendant's conduct under similar contracts entered into with plaintiff, and by other proof that in the indemnity clause the parties meant to cover injury to property of third parties only and not to plaintiff's property.[1] Although the trial court observed that the language used was "the classic language for a third party indemnity provision" and that "one could very easily conclude that . . . its whole intendment is to indemnify third parties," it nevertheless held that the "plain language" of the agreement also required defendant to indemnify plaintiff for injuries to plaintiff's property. Having determined that the contract had a plain meaning, the court refused to admit any extrinsic evidence that would contradict its interpretation.

When the court interprets a contract on this basis, it deter-

---

[1]Although this offer of proof might ordinarily be regarded as too general to provide a ground for appeal (Evid. Code, § 354, subd. (a); *Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 522 [297 P.2d 428]; *Stickel v. San Diego Elec. Ry. Co.* (1948) 32 Cal.2d 157, 162-164 [195 P.2d 416]; *Douillard* v. *Woodd* (1942) 20 Cal.2d 665, 670 [128 P.2d 6]), since the court repeatedly ruled that it would not admit extrinsic evidence to interpret the contract and sustained objections to all questions seeking to elicit such evidence, no formal offer of proof was required. (Evid. Code, § 354, subd. (b); *Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co., supra,* 46 Cal.2d 517, 522; *Estate of Kearns* (1950) 36 Cal.2d 531, 537 [225 P.2d 218].)

mines the meaning of the instrument in accordance with the ". . . extrinsic evidence of the judge's own linguistic education and experience." (3 Corbin on Contracts (1960 ed.) [1964 Supp. § 579, p. 225, fn. 56].) The exclusion of testimony that might contradict the linguistic background of the judge reflects a judicial belief in the possibility of perfect verbal expression. (9 Wigmore on Evidence (3d ed. 1940) § 2461, p. 187.) This belief is a remnant of a primitive faith in the inherent potency[2] and inherent meaning of words.[3]

The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal. 2d 512, 520-521 [67 Cal.Rptr. 761, 439 P.2d 889]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Hulse* v. *Juillard Fancy Foods Co.* (1964) 61 Cal.2d 571, 573 [39 Cal.Rptr. 529, 394 P.2d 65]; *Nofziger* v. *Holman* (1964) 61 Cal.2d 526, 528 [39 Cal. Rptr. 384, 393 P.2d 696]; *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]; *Imbach* v. *Schultz* (1962) 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]; *Reid* v. *Overland Machined Products* (1961) 55 Cal.2d 203, 210 [10 Cal.Rptr. 819, 359 P.2d 251].)

A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained.

[2]E.g., "The elaborate system of taboo and verbal prohibitions in primitive groups; the ancient Egyptian myth of Khern, the apotheosis of the words, and of Thoth, the Scribe of Truth, the Giver of Words and Script, the Master of Incantations; the avoidance of the name of God in Brahmanism, Judaism and Islam; totemistic and protective names in mediaeval Turkish and Finno-Ugrian languages; the misplaced verbal scruples of the 'Précieuses'; the Swedish peasant custom of curing sick cattle smitten by witchcraft, by making them swallow a page torn out of the psalter and put in dough. . . .' from Ullman, The Principles of Semantics (1963 ed.) 43. (See also Ogden and Richards, The Meaning of Meaning (rev. ed. 1956) pp. 24-47.)

[3]" 'Rerum enim vocabula immutabilia sunt, homines mutabilia,' " (Words are unchangeable, men changeable) from Dig. XXXIII, 10, 7, § 2, *de sup. leg.* as quoted in 9 Wigmore on Evidence, *op. cit. supra*, § 2461, p. 187.

Some courts have expressed the opinion that contractual obligations are created by the mere use of certain words, whether or not there was any intention to incur such obligations.[4] Under this view, contractual obligations flow, not from the intention of the parties but from the fact that they used certain magic words. Evidence of the parties' intention therefore becomes irrelevant.

■ In this state, however, the intention of the parties as expressed in the contract is the source of contractual rights and duties.[5] A court must ascertain and give effect to this intention by determining what the parties meant by the words they used. Accordingly, the exclusion of relevant, extrinsic, evidence to explain the meaning of a written instrument could be justified only if it were feasible to determine the meaning the parties gave to the words from the instrument alone.

If words had absolute and constant referents, it might be possible to discover contractual intention in the words themselves and in the manner in which they were arranged. Words, however, do not have absolute and constant referents. ■ "A word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, . . ." (*Pearson* v. *State Social Welfare Board* (1960) 54 Cal. 2d 184, 195 [5 Cal.Rptr. 553, 353 P.2d 33].) The meaning of particular words or groups of words varies with the ". . . verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges). . . . A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning." (Corbin, *The Interpretation of Words and the Parol Evidence Rule* (1965) 50 Cornell L.Q. 161, 187.) ■ Accordingly, the meaning of a writing ". . . can only be found by inter-

---

[4] "A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent." (*Hotchkiss* v. *National City Bank of New York* (S.D.N.Y. 1911) 200 F. 287, 293. See also *C. H. Pope & Co.* v. *Bibb Mfg. Co.* (2d Cir. 1923) 290 F. 586, 587; see 4 Williston on Contracts (3d ed. 1961) § 612, pp. 577-578, § 613, p. 583.)

[5] "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636; see also Code Civ. Proc., § 1859; *Universal Sales Corp.* v. *California Press Mfg. Co.* (1942) 20 Cal.2d 751, 760 [128 P.2d 665]; *Lemm* v. *Stillwater Land & Cattle Co.* (1933) 217 Cal. 474, 480 [19 P.2d 785].)

pretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended. [Citations omitted.]" (*Universal Sales Corp.* v. *California Press Mfg. Co.*, supra, 20 Cal.2d 751, 776 (concurring opinion); see also, e.g., *Garden State Plaza Corp.* v. *S. S. Kresge Co.* (1963) 78 N.J. Super. 485 [189 A.2d 448, 454]; *Hurst* v. *W. J. Lake & Co.* (1932) 141 Ore. 306, 310 [16 P.2d 627, 629, 89 A.L.R. 1222]; 3 Corbin on Contracts (1960 ed.) § 579, pp. 412-431; Ogden and Richards, The Meaning of Meaning, *op.cit supra* 15; Ullmann, The Principles of Semantics, supra, 61; McBaine, *The Rule Against Disturbing Plain Meaning of Writings* (1943) 31 Cal.L.Rev. 145.)

Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage,[6] but exists whenever the parties' understanding of the words used may have differed from the judge's understanding.

Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to

[6]Extrinsic evidence of trade usage or custom has been admitted to show that the term "United Kingdom" in a motion picture distribution contract included Ireland (*Ermolieff* v. *R.K.O. Radio Pictures, Inc.* (1942) 19 Cal.2d 543, 549-552 [122 P.2d 3]); that the word "ton" in a lease meant a long ton or 2,240 pounds and not the statutory ton of 2,000 pounds (*Higgins* v. *California Petroleum etc. Co.* (1898) 120 Cal. 629, 630-632 [52 P. 1080]); that the word "stubble" in a lease included not only stumps left in the ground but everything "left on the ground after the harvest time" (*Callahan* v. *Stanley* (1881) 57 Cal. 476, 477-479); that the term "north" in a contract dividing mining claims indicated a boundary line running along the "magnetic and not the true meridian" (*Jenny Lind Co.* v. *Bower* (1858) 11 Cal. 194, 197-199) and that a form contract for purchase and sale was actually an agency contract. (*Body-Steffner Co.* v. *Flotill Products* (1944) 63 Cal. App.2d 555, 558-562 [147 P.2d 84]). See also Code Civ. Proc., § 1861; Annot., 89 A.L.R. 1228; Note (1942) 30 Cal.L.Rev. 679.)

prove the intention of the parties.[7] (Civ. Code, § 1647; Code
Civ. Proc., § 1860; see also 9 Wigmore on Evidence, *op. cit.
supra*, § 2470, fn. 11, p. 227.) Such evidence includes testi-
mony as to the "circumstances surrounding the making of the
agreement . . . including the object, nature and subject mat-
ter of the writing . . ." so that the court can "place itself in
the same situation in which the parties found themselves at
the time of contracting." (*Universal Sales Corp.* v. *Califor-
nia Press Mfg. Co., supra*, 20 Cal.2d 751, 761; *Lemm* v. *Still-
water Land & Cattle Co., supra*, 217 Cal. 474, 480-481.) ▮ If
the court decides, after considering this evidence, that the
language of a contract, in the light of all the circumstances,
"is fairly susceptible of either one of the two interpretations
contended for . . . " (*Balfour* v. *Fresno C. & I. Co.* (1895)
109 Cal. 221, 225 [41 P. 876]; see also, *Hulse* v. *Juillard
Fancy Foods Co., supra*, 61 Cal.2d 571, 573; *Nofziger* v. *Hol-
man, supra*, 61 Cal.2d 526, 528; *Reid* v. *Overland Machined
Products, supra*, 55 Cal.2d 203, 210; *Barham* v. *Barham*
(1949) 33 Cal.2d 416, 422-423 [202 P.2d 289]; *Kenney* v. *Los
Feliz Investment Co.* (1932) 121 Cal.App. 378, 386-387 [9
P.2d 225]), extrinsic evidence relevant to prove either of such
meanings is admissible.[8]

▮ In the present case the court erroneously refused to
consider extrinsic evidence offered to show that the indemnity
clause in the contract was not intended to cover injuries to
plaintiff's property. Although that evidence was not neces-
sary to show that the indemnity clause was reasonably sus-
ceptible of the meaning contended for by defendant, it was
nevertheless relevant and admissible on that issue. Moreover,
since that clause was reasonably susceptible of that meaning,

---

[7]When objection is made to any particular item of evidence offered
to prove the intention of the parties, the trial court may not yet be in a
position to determine whether in the light of all of the offered evidence,
the item objected to will turn out to be admissible as tending to prove a
meaning of which the language of the instrument is reasonably sus-
ceptible or inadmissible as tending to prove a meaning of which the
language is not reasonably susceptible. In such case the court may admit
the evidence conditionally by either reserving its ruling on the objection
or by admitting the evidence subject to a motion to strike. (See Evid.
Code, § 403.)

[8]Extrinsic evidence has often been admitted in such cases on the
stated ground that the contract was ambiguous (e.g., *Universal Sales
Corp.* v. *California Press Mfg. Co., supra*, 20 Cal.2d 751, 761). This
statement of the rule is harmless if it is kept in mind that the ambiguity
may be exposed by extrinsic evidence that reveals more than one possible
meaning.

the offered evidence was also admissible to prove that the clause had that meaning and did not cover injuries to plaintiff's property.[9] Accordingly, the judgment must be reversed.

■ Two questions remain that may arise on retrial. On the theory that the indemnity clause covered plaintiff's property, the trial court instructed the jury that plaintiff was entitled to recover unless all of ". . . the following conditions [were found] to exist:

"1. That Pacific Gas and Electric Company continued to

[9]The court's exclusion of extrinsic evidence in this case would be error even under a rule that excluded such evidence when the instrument appeared to the court to be clear and unambiguous on its face. The controversy centers on the meaning of the word "indemnify" and the phrase "all loss, damage, expense and liability." The trial court's recognition of the language as typical of a third party indemnity clause and the double sense in which the word "indemnify" is used in statutes and defined in dictionaries demonstrate the existence of an ambiguity. (Compare Civ. Code, § 2772, "Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person," with Civ. Code, § 2527, "Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability, arising from an unknown or contingent event." Black's Law Dictionary (4th ed. 1951) defines "indemnity" as "A collateral contract or assurance, by which one person engages to secure another against an anticipated loss or to prevent him from being damnified by the legal consequences of an act or forbearance on the part of one of the parties or of some third person." Stroud's Judicial Dictionary (2d ed. 1903) defines it as a "Contract . . . to indemnify against a liability. . . ." One of the definitions given to "indemnify" by Webster's Third New International Dict. (1961 ed.) is "to exempt from incurred liabilities.")

Plaintiff's assertion that the use of the word "all" to modify "loss, damage, expense and liability" dictates an all inclusive interpretation is not persuasive. If the word "indemnify" encompasses only third-party claims, the word "all" simply refers to all such claims. The use of the words "loss," "damage," and "expense" in addition to the word "liability" is likewise inconclusive. These words do not imply an agreement to reimburse for injury to an indemnitee's property since they are commonly inserted in third-party indemnity clauses, to enable an indemnitee who settles a claim to recover from his indemnitor without proving his liability. (*Carpenter Paper Co.* v. *Kellogg* (1952) 114 Cal.App.2d 640, 651 [251 P.2d 40]. Civ. Code, § 2778, provides: "1. Upon an indemnity against liability . . . the person indemnified is entitled to recover upon becoming liable; 2. Upon an indemnity against claims, or demands, or damages, or costs . . . the person indemnified is not entitled to recover without payment thereof; . . .")

The provision that defendant perform the work "at his own risk and expense" and the provisions relating to insurance are equally inconclusive. By agreeing to work at its own risk defendant may have released plaintiff from liability for any injuries to defendant's property arising out of the contract's performance, but this provision did not necessarily make defendant an insurer against injuries to plaintiff's property. Defendant's agreement to procure liability insurance to cover damages to plaintiff's property does not indicate whether the insurance was to cover all injuries or only injuries caused by defendant's negligence.

maintain independent operation on the premises whereon the installation of the cover was in progress;

"2. That the damage to the turbine was unrelated to the Defendant G. W. Thomas Drayage & Rigging Company, Inc.'s performance;

"3. That the plaintiff was guilty of active, affirmative negligence; and

"4. That such active negligence related to a matter over which the plaintiff exercised exclusive control."

The instruction was based on certain guidelines discussed in *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 45-46 [41 Cal.Rptr. 73, 396 P.2d 377]; *Harvey Machine Co.* v. *Hatzel & Buehler, Inc.* (1960) 54 Cal.2d 445, 448 [6 Cal.Rptr. 284, 353 P.2d 924]; and *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co.* (1962) 202 Cal.App.2d 99, 112-113 [20 Cal.Rptr. 820]. Those cases do not hold, however, that all four conditions specified in the instruction must exist for the indemnitor to be relieved of liability. It is sufficient if the indemnitee's own active negligence is a cause of the harm. As stated in *Markley* v. *Beagle* (1967) 66 Cal.2d 951, 952 [59 Cal.Rptr. 809, 429 P.2d 129], "An indemnity clause phrased in general terms will not be interpreted . . . to provide indemnity for consequences resulting from the indemnitee's own actively negligent acts."

To prove the amount of damages sustained, plaintiff presented invoices received from Ingersoll-Rand, the manufacturer and repairer of the turbine, the drafts by which plaintiff had remitted payment, and testimony that payment had been made. Defendant objected to the introduction of the invoices on the ground that they were hearsay. Subsequently, plaintiff called a mechanical engineer who qualified as an expert witness on the repair of turbines. On the basis of photographs of the damage after the accident, he testified that to repair the turbine it was reasonable and necessary to dismantle it completely, magnaflux all parts, replace all blades in wheels that had been damaged, reassemble the rotor, balance it, "indicate" it and centrifugate it. Similar repairs were listed in the invoices, and over objection the witness was allowed to testify that the amounts charged therefor were reasonable.

█ Since invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for the repairs was incurred, that payment was made, or

that the charges were reasonable. (*Plonley* v. *Reser* (1960) 178 Cal.App.2d Supp. 935, 937-939 [3 Cal.Rptr. 551, 80 A.L.R 2d 911] ; *Menefee* v. *Raisch Improvement Co.* (1926) 78 Cal. App. 785, 789 [248 P. 1031].) If, however, a party testifies that he incurred or discharged a liability for repairs, any of these documents may be admitted for the limited purpose of corroborating his testimony (*Bushnell* v. *Bushnell* (1925) 103 Conn. 583 [131 A. 432, 436, 44 A.L.R. 788] ; *Cain* v. *Mead* (1896) 66 Minn. 195 [68 N.W. 840, 841]), and if the charges were paid, the testimony and documents are evidence that the charges were reasonable. (*Dewhirst* v. *Leopold* (1924) 194 Cal. 424, 433 [229 P. 30] ; *Smith* v. *Hill* (1965) 237 Cal.App. 2d 374, 388 [47 Cal.Rptr. 49] ; *Meier* v. *Paul X. Smith Corp.* (1962) 205 Cal.App.2d 207, 222 [22 Cal.Rptr. 758] ; *Malinson* v. *Black* (1948) 83 Cal.App.2d 375, 379 [188 P.2d 788] ; *Laubscher* v. *Blake* (1935) 7 Cal.App.2d 376, 383 [46 P.2d 836]. See also *Gimbel* v. *Laramie* (1960) 181 Cal.App.2d 77, 81 [5 Cal.Rptr. 88].) Since there was testimony in the present case that the invoices had been paid, the trial court did not err in admitting them.

The individual items on the invoices, however, were read, not to corroborate payment or the reasonableness of the charges, but to prove that these specific repairs had actually been made. No qualified witness was called to testify that the invoices accurately recorded the work done by Ingersoll-Rand, and there was no other evidence as to what repairs were made. This use of the invoices was error. (*California Steel Buildings, Inc.* v. *Transport Indemnity Co.* (1966) 242 Cal.App.2d 749, 759 [51 Cal.Rptr. 797]. Accord, *Bushnell* v. *Bushnell, supra,* 103 Conn. 583 [131 A. 432, 436] ; *Ferraro* v. *Public Service Ry. Co.* (1928) 6 N.J. Misc. 463 [141 A. 590] ; *Nock* v. *Lloyd* (1911) 32 R.I. 313 [79 A. 832, 833].) An invoice submitted by a third party is not admissible evidence on this issue unless it can be admitted under some recognized exception to the hearsay rule.[10]

Since plaintiff's expert's testimony as to the reasonableness of the charges was based on hearsay evidence inadmissible to prove that the repairs had been made, defend-

---

[10]It might come in under the business records exception (Evid. Code, § 1271) if "... supported by the testimony of a witness qualified to testify as to its identity and the mode of its preparation." (*California Steel Buildings, Inc.* v. *Transport Indemnity Co., supra,* 242 Cal.App.2d 749, 759.)

ant's objections to it should have been sustained. "[A]n expert must base his opinion either on facts personally observed or on hypotheses that find support in the evidence." (*George* v. *Bekins Van & Storage Co.* (1949) 33 Cal.2d 834, 844 [205 P.2d 1037]. See also *Kastner* v. *Los Angeles Metropolitan Transit Authority* (1965) 63 Cal.2d 52, 58 [45 Cal. Rptr. 129, 403 P.2d 385]; *Commercial Union Assur. Co.* v. *Pacific Gas & Electric Co.* (1934) 220 Cal. 515, 524 [31 P.2d 793]; *Behr* v. *County of Santa Cruz* (1959) 172 Cal.App.2d 697, 709 [342 P.2d 987]; 2 Jones on Evidence (5th ed. 1958) § 416, pp. 782-783.)

The judgment is reversed.

Peters, J., Mosk, J., Burke, J., Sullivan, J., and Peek, J.,* concurred.

McComb, J., dissented.

_____

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.