**BARRIS INDUSTRIES, INC.,**
Plaintiff–Counter–Defendant/Appellee,

v.

**WORLDVISION ENTERPRISES, INC.,**
Defendant–Counter–Claimant/Appellant.

No. 87–5726.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1988.

Decided June 1, 1989.

Hayward J. Kaiser and Charles M. Firestone, Mitchell, Silberberg and Knupp, Los Angeles, Cal., for plaintiff-counter-defendant/appellee.

Joan Wolff, Horvitz, Levy and Amerian, Encino, Cal., for defendant-counter-claimant/appellant.

Before GOODWIN, Chief Judge, HALL, Circuit Judge, and PANNER,* District Judge.

* The Honorable Owen M. Panner, Chief United States District Judge, District of Oregon, sitting by designation.

GOODWIN, Chief Judge:

Barris Industries, Inc. is the producer of the "Newlywed Game" television program. Worldvision Enterprises, Inc. is the exclusive distributor (with certain exceptions) of the program. This case involves a dispute over entitlement to statutory cable royalty fees which were due to the copyright owner of the Game as a result of secondary transmission of the Game by cable rebroadcast. Worldvision appeals from summary judgment which granted Barris the right to receive 100 percent of these fees. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

The parties entered into the contract in issue on September 19, 1977. Under the contract Worldvision agreed to act as an independent sales representative and exclusive distributor of the Game outside the geographically excluded markets of St. Louis, New York and Los Angeles ("excluded markets"). Worldvision's right to distribute was defined in paragraph one as the right to license the game for television exhibition. "Television" was defined in the agreement to exclude various forms of transmission ("excluded television"). "CATV systems" were within the definition of excluded television. The term CATV includes cable television.

In paragraph nine of the agreement, Barris agreed to pay Worldvision "[a]s full and complete compensation," 30 percent of "gross receipts." Gross receipts were defined as "all licence fees actually received by us under the License Agreements (exclusive, of course, of agreements relating to the excluded markets) entered into during the term hereof for the Programs ... less [certain deductions]." No reference was made to so-called "statutory cable royalties," that is, fees obtained under compulsory licenses when cable television entities retransmit non-network television such as the Game beyond the range of broadcast television.

The Copyright Act of 1976 became effective in 1978, after the Barris–Worldvision agreement had been made. 17 U.S.C. § 101 et seq. (1982). Prior to its enactment, cable operators could pick up programs broadcast by over-the-air television stations and rebroadcast those programs with no obligation to pay royalties to the copyright owner. See Fortnightly Corp. v. United Artists T.V., Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). The Act changed this. Under it, cable operators had to obtain a copyright license and periodically pay royalty fees into a central fund, the distribution of which was charged to a newly created Copyright Royalty Tribunal. 17 U.S.C. § 111(c) and (d). These fees were to be distributed to "copyright owners who claim that their works were the subject of secondary transmission by cable systems." 17 U.S.C. § 111(d)(4). However, when the CRT initiated its first royalty distribution under the new scheme in August 1979 for 1978 calendar year royalties, the procedures for claiming fees by copyright owners and the CRT's methods for resolving disputes over distribution were far from clear.

Although Worldvision and Barris had never specifically mentioned or negotiated respective rights to the statutory cable royalties under the Act, Worldvision assumed that it was entitled to all or a portion of such royalties as fruits of Worldvision's licensing efforts under the agreement. Beginning in 1979, Neil Delman, counsel for Worldvision, filed yearly claims under Worldvision's name for statutory cable royalties accrued as a result of secondary cable transmission of the Game. Under the confusing CRT rules, claimants had to identify only a single secondary cable transmission in order to claim statutory cable royalties for all secondary cable transmissions of a particular television program or series. Worldvision relied in its 1979 application on identified secondary cable transmissions of the Game and in the 1980 application on secondary cable transmissions of other shows distributed by Worldvision. Worldvision believed that the CRT rules allowed a claimant to claim royalties for all programs in which the claimant asserted a copyright interest by identifying a single secondary cable transmission of a single claimant program.

Barris did not file a claim in 1979. In 1980, Seymour Bricker, outside counsel for Barris, filed a claim for the Game based on a single secondary cable transmission of a different Barris-produced program. At that time, Bricker was aware of Worldvision's 1979 claim for the Game, but no communication on this subject occurred between the parties at that time.

According to Bricker's declaration, Bricker was uncertain whether Worldvision's claim was valid (as being brought by the distributor) and whether any claim based on identification or transmission of a different program was valid. Purportedly to ensure that there was a claim filed for the Game in 1981, Bricker wrote Worldvision on July 7, 1981 to determine whether Worldvision was filing a claim for the Game and asking Worldvision to file a joint claim. Delman received the letter and called Bricker. As to this telephone communication, Delman states in his declaration that he told Bricker that Worldvision had applied for statutory cable royalties and that upon receipt and accounting of the royalties, Worldvision would remit the portion in excess of its contractual commission. Delman states that Bricker never contested Worldvision's right to a commission on the royalties, and in fact urged expeditious remittance. Bricker denies impliedly or expressly acceding to Worldvision's right to such a commission. Bricker declares that Delman instead told him that Worldvision was too busy to file a claim and asked Bricker to do so.

It is undisputed that both Worldvision and Barris filed claims for the Game in 1981, after Bricker's letter and the disputed conversation. Both parties relied on secondary cable transmissions of the Game. Worldvision's claim named only Worldvision as beneficiary, but Barris filed a "joint" claim naming both Worldvision and Barris as beneficiaries.

In 1982 and 1983, Worldvision filed separate claims, not mentioning Barris or the Game. Barris also filed separate claims, not mentioning Worldvision, but citing secondary cable transmissions of the Game. The issue of statutory cable royalties did not arise again until May 1983. Delman told Bricker in passing that Worldvision had been receiving statutory cable royalties for the Game since 1981 through its designated agent to the Tribunal, the Motion Picture Association of America (MPAA). The MPAA was also Barris' agent. Prior to the May 1983 meeting, however, Barris had been unable to confirm what payments were made to Worldvision by MPAA. Bricker confronted Delman and demanded an accounting of the Game's royalties. Delman interpreted the request as one for the contractual 30/70 percent allocation. In a letter to Delman dated May 10, 1983, Bricker repeated Barris' demand for an accounting of the MPAA distributions, but did not specify whether Barris was entitled to all of the receipts or only 70 percent. In June, 1983, Worldvision remitted to Barris $95,214, an amount reflecting a 70 percent share of the $136,020 in total royalty distributions.

On August 3, 1983, Barris' outside counsel made a written demand upon Worldvision for the retained 30 percent of the royalties. Counsel cited to specific sections of the agreement which purportedly excluded any Worldvision right or obligation relating to cable television. Worldvision refused Barris' demand and on August 12, 1983, Barris wrote the MPAA, asking it to escrow all further Tribunal royalty distributions under the parties' claims for the Game, pending resolution of their dispute. Subsequently, Worldvision requested the MPAA to withhold all further distributions, including the 70 percent which only Barris claimed. The MPAA complied and as of March 11, 1985, the escrowed funds totalled $113,919.

The trial court held that there was no genuine issue of material fact and that Barris, the moving party, was entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *International Union of Bricklayers v. Martin Jaska, Inc.,* 752 F.2d 1401, 1404 (9th Cir.1985). On appeal of a summary judgment, all possible inferences from the record must be drawn in favor of the non-moving party. *Castenada v. DuraVent Corp.,* 648 F.2d 612, 617 (9th Cir.1981) (citations omitted).

Worldvision makes two arguments that it is entitled to all or part of the statutory cable royalties. First, it argues that as distributor of the Game, irrespective of the parties' intentions with respect to statutory royalties at the time of contracting, it is entitled to the royalties as a matter of law. Second, it asserts that consideration of the parties' conduct, especially Bricker's alleged agreement on behalf of Barris that the royalties should be split 70/30, evinces an intention of the parties under the contract to divide the statutory cable royalties like other license fees. Because we believe that the question of entitlement must ultimately turn on what the parties intended when they entered into the contract, and because the contract unambiguously limits Worldvision's compensation to 30 percent of amounts received under the license agreements it negotiated, we reject both of these arguments.

Worldvision first argues that it is the distributor of a program to over-the-air television that Congress intended to receive royalties under § 111. For support of this position, Worldvision relies mainly on the language of the CRT in its 1984 Cable Royalty Distribution Proceeding. 52 Fed. Reg. 8408 (1987). In that proceeding the CRT considered competing claims of NBC, the producer of the "Little House on the Prairie" program, and Worldvision, the program's exclusive syndicator. The Tribunal there "identifie[d] the exclusive syndicator of off-network programming, among all those parties in the chain of production and distribution, as the party to whom the Tribunal has in the past and will consistently in the future distribute Section 111 royalties." 52 Fed.Reg. at 8411.

■ Worldvision urges us to conclude from this that a general rule exists that where the copyright is divided among two or more parties, the distributor of the program to over-the-air television is entitled to retain the statutory cable royalties under § 111. In reviewing the Tribunal ruling upon which Worldvision relies, the D.C. Circuit rejected this general rule. *National Broadcasting Company Inc. v. Copyright Royalty Tribunal*, 848 F.2d 1289 (D.C.Cir.1988). The court distinguished between "the proper *distributee*" of the fees and the ownership of the copyright to which the royalties attach. The court ruled that the CRT was not authorized to determine legal ownership of the relevant copyright. It therefore concluded that "the CRT's ruling should not be seen at all as adjudicating the contractual entitlement rights of NBC and Worldvision, but rather as setting forth a general rule for the *distribution* of cable royalties in these cases." *Id.* at 1296 (emphasis added). Thus, the general rule favoring syndicators should not be seen as determinative of ownership. Ownership of the relevant copyright instead is a matter to be determined from the parties' contract. The Tribunal recognized this when it concluded that although it would make initial distribution of the royalties to Worldvision it would not decide "whether the actual terms used in the contracts fail to convey to Worldvision the pertinent copyright for cable royalty distribution." 52 Fed.Reg. at 8412. We agree with the D.C. Circuit that "ownership is itself dependent on the contractual terms; it cannot be settled without reference to those terms." *National Broadcasting*, 848 F.2d at 1294. We therefore reject Worldvision's contention that its position as distributor entitles it to statutory cable royalties as a matter of law.[1]

Focusing on the intent of the parties brings us to Worldvision's second argument. Worldvision contends that certain of Barris' post-contract actions create a triable issue of fact concerning the intention of the parties regarding the proper division of statutory cable royalties. Worldvision alleges, and we must accept as true for purposes of reviewing a summary judgment, that when Delman told Bricker in

---

**1.** Barris brought this diversity action seeking adjudication of the parties' contractual rights to the royalties. While we hold that Barris owns 100% of the royalties, we do not reach the issue of whether it is appropriate for the CRT to distribute royalties to Barris in the first instance. *See National Broadcasting*, 848 F.2d at 1296 (distinguishing between distribution and ownership of royalties).

1981 that Worldvision would remit to Barris 70 percent of the statutory cable royalties it had received for the Game, Bricker did not object to this division and in fact urged speedy payment. Worldvision also points to the fact that Barris submitted a joint claim for royalties on behalf of itself and Worldvision in 1981, and requested that Worldvision submit a joint claim in the same year. Worldvision contends that this extrinsic evidence supports its view that the parties intended to include statutory royalties within "gross receipts," which were to be divided 70 percent/30 percent between Barris and Worldvision.

The district court refused to consider Worldvision's extrinsic evidence, finding that the contract was not reasonably susceptible to Worldvision's proffered interpretation. *See Pacific Gas and Electric Co. v. G.W. Thomas Drayage and Rigging Co.*, 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968). Our task is to determine if and to what degree the evidence should have been considered, and whether it creates a genuine issue of material fact sufficient to withstand summary judgement.

■■■ Under the terms of the contract, California law governs interpretation. We have recently had occasion to review California's permissive appoach to extrinsic evidence in contract interpretation. *See Trident Center v. Connecticut General Life Insurance Company*, 847 F.2d 564 (9th Cir.1988); *A. Kemp Fisheries Inc. v. Castle and Cooke, Inc.*, 852 F.2d 493 (9th Cir.1988). Under California law, "[t]he test of admissibilty of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible." *Thomas Drayage*, 69 Cal.Rptr. at 564, 442 P.2d at 644. Thus, even if a contract appears to be absolutely clear on its face, the court is required to engage in preliminary consideration of extrinsic evidence to see whether it creates an ambiguity. However, if the extrinsic evidence advances an interpretation to which the contract is not reasonably susceptible, the extrinsic evidence is not admissible. *A. Kemp Fisheries*, 852 F.2d at 496. Further, the mere existence of extrinsic evidence supporting an alternative meaning does not foreclose summary judgment where the extrinsic evidence is insufficient to render the contract susceptible to the non-movant's proffered interpretation. *Trident Center*, 847 F.2d at 570 n. 6.

■■ While the district court purported not to consider Worldvision's extrinsic evidence at all, a footnote in its decision indicates that in fact it did follow the procedures set forth in *Thomas Drayage* by preliminarily considering the evidence before rejecting it: "Even if the court were to consider parole evidence it would find the proffered parole evidence neither relevant nor admissible to prove any asserted interpretation to which the contract language is reasonably susceptible." Order Granting Plaintiff's Motion for Summary Judgement, at 13 n. 3.

We agree with the district court that the Barris–Worldvision agreement is not reasonably susceptible to the meaning proffered by Worldvision, that is, that the parties contracted to divide statutory cable royalties as part of gross receipts. First, the actions of Barris on which Worldvision relies were not in any clear sense indicative of Barris' understanding of the meaning of the contract. Rather they reflect some confusion regarding new and unclear procedures with respect to distribution and entitlement to cable royalties. Post-contract constructions by the parties themselves may be considered only when the acts of the parties were positive and deliberate and done in attempted compliance with the terms of the agreement. *United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.*, 263 Cal.App.2d 531, 538, 69 Cal.Rptr. 373 (Cal.Dist.Ct.App.1968).

Second, as Worldvision admits, the parties did not make specific provision for division of cable royalties in their contract. The absence of any indication that the parties contemplated the issue belies Worldvision's suggestion that they intended to divide the royalties like other license fees.

Finally, and most important, there is the language of the agreement itself. We agree with Worldvision that the district court placed too much emphasis on the fact that Worldivision was restricted from distributing the Game to cable television. Despite this restriction it would have been quite possible for the parties to agree that Worldvision would receive all or part of the royalties flowing from cable rebroadcast of transmissions by over-the-air television. Still, the compensation clause of the agreement is unambiguous and therefore dispositive. It provides that Worldvision is to receive as "full and complete compensation," thirty percent of gross receipts, defined as "all license fees actually received by us under License Agreements...." "Under License Agreements" clearly refers to amounts received from over-the-air television stations with whom Worldvision negotiated agreements and not to amounts received as statutory cable royalties.

Because the contract is only susceptible to an interpretation which limits Worldvision's compensation to 30 percent of gross receipts, as specifically and clearly defined in the contract, summary judgment for Barris was appropriate.

AFFIRMED.