**L.J. STEPHENS; G. Maxine Stephens, Plaintiffs–Appellees,**

v.

**CITY OF VISTA; Orbee Mihalek; Gloria E. McClellan; Robert C. K. Foo, et al., Defendants–Appellants.**

**No. 91–56297.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 2, 1993.

Decided May 20, 1993.

As Amended on Denial of Rehearing Aug. 4, 1993.

John Morris, Jeffrey R. Davis, Higgs, Fletcher & Mack, San Diego, CA, for defendants-appellants.

Michael S. Gatzke, Martha L. Archibald, Gatzke, Mispagel & Dillon, Carlsbad, CA, for plaintiffs-appellees.

Before: WALLACE, Chief Judge, SNEED and HALL, Circuit Judges.

SNEED, Circuit Judge:

The City of Vista, California timely appeals the judgment of the district court in favor of L.J. Stephens and G. Maxine Stephens (the Stephenses) on their claim for breach of settlement agreement. The settlement agreement at issue was the result of the Stephenses' action against the City for inverse condemnation and for deprivation of civil rights under 42 U.S.C. § 1983. We affirm.

## I.

### FACTS AND PRIOR PROCEEDINGS

The Stephenses purchased the property which is the subject of this litigation in 1973 for the purpose of developing an apartment complex of approximately 140 to 150 units. In 1976, the owner of an adjoining parcel submitted plans to the City which included a proposed lowering of "Street A" which had been contemplated as the primary access to the Stephenses' property. The City approved the lowering of Street A which made it difficult to service the Stephenses' property because of the extreme differences in elevation between the street and the property.

### A. Stephenses' Suit For Inverse Condemnation

As a result, the Stephenses filed an action against the City in state court for inverse condemnation. While the state court action was pending, the City rezoned the Stephenses' property which reduced the permissible density from approximately 145 to 150 units to 50 units.

### B. Stephenses' Civil Rights Action

In 1981, the Stephenses filed an action against the City and certain city officials in the United States District Court for the Southern District of California for violations of their civil and constitutional rights and for inverse condemnation based on the lowering of Street A and the down-zoning of their property.

In May 1983, the City moved for judgment on the pleadings or in the alternative for summary judgment, arguing that the district

court lacked subject matter jurisdiction over the controversy and that the Stephenses failed to state a claim under 42 U.S.C. § 1983. Alternatively, the City maintained that the court should abstain from adjudicating the matter pending resolution of the Stephenses' state court action.

### C. Settlement Negotiations and Terms of Settlement

The court denied the City's motion, and thereafter, the City entered into settlement negotiations with the Stephenses. The parties discussed the permissible development density for the property and certain design problems, and the Stephenses' support of the City's formation of the "Escondido Avenue Assessment District" (EAAD).[1] The Stephenses maintain they initially wanted the City to agree to zoning which would allow for the construction of 210 units but later settled for 140 units.

The Stephenses and the City reached a settlement. The settlement agreement called for the Stephenses to dismiss all their pending litigation against the City and city officials and to support the formation of the EAAD. Regarding the City's performance, the agreement provided:

3.1 The City shall approve a rezoning of Parcel A [the Stephenses' property] to a use not less than zone R–M–30(Q), permitting development at the ratio of one unit per 3000 square feet of land area. This will permit a maximum total development on Parcel A of 140 dwelling units.

.    .    .    .    .

3.6 The City shall approve a specific plan for the development of Parcel A ("the specific plan") which shall create and constitute a binding and continuing obligation of the City with respect to the development of parcel A, and which shall include the following provisions:

3.6.1 The specific plan shall permit a land use equivalent to a zoning of R–M–30(Q), permitting construction of a maximum 140 residential units on Parcel A.

---

1. The purpose of the EAAD was to widen Escon-    dido Avenue, a major thoroughfare in the City.

The City Council reviewed and approved the settlement agreement, and it was executed by both parties. Subsequently, the agreement was approved by the district court, made part of the record, and expressly incorporated into the judgment.

The Stephenses submitted a specific plan for the property, and the City Council adopted the plan and rezoned the property to R–M–30(Q). The Q designation or "Q overlay" required that once the zone was established, a "site development plan" had to be submitted to the City Planning Commission instead of simply to the City Planning staff. The Stephenses submitted to the Planning Commission a site development plan which proposed the construction of a 140 unit apartment complex. On September 1, 1987, after a public hearing, the Planning Commission voted 5–2 in favor of a resolution approving the site development plan and imposed certain design conditions on the project.[2] On September 9, 1987, the City's mayor, Gloria McClellan, appealed the Planning Commission's approval of the plan to the City Council.

### D. Denial of Site Development Plan Without Prejudice

The City Council first considered the appeal at a regularly scheduled public meeting held on September 28, 1987. The primary objection of the opponents to the plan was the density of the proposed project. At the close of the meeting, the Council referred the matter back to the City Planning staff in order for the staff to meet with the Stephenses and concerned residents to review density and traffic issues, and attempt a compromise. At the direction of the Council, the Planning staff proposed 11 modifications to the project which would "better affect the density, open space, access and other design features of the project." The Stephenses were willing to compromise on various design issues, but not on the density of the project. The City Council held a final hearing on

December 14, 1987 and voted 3–2 to deny the site development plan without prejudice and to adopt the Planning staff's recommendation that the Stephenses resubmit a plan which followed the 11 specified modifications.

### E. Revival of Original Action

The Stephenses then reinstituted their original action, filing an amended complaint in the district court against the City and Mayor McClellan alleging inverse condemnation, breach of the settlement agreement, and violations of their civil and constitutional rights under 42 U.S.C. § 1983.

### F. Decisions by Court

The City brought a motion for dismissal, judgment on the pleadings, or in the alternative, abstention. The court decided to abstain from adjudication of the Stephenses' claim for inverse condemnation, and denied the City's request for dismissal and judgment on the pleadings.

The remaining claims were tried before the district court. The court concluded that the City had breached the settlement agreement.[3] It found that the guaranteed density of a 140 unit development was the principal consideration for which the Stephenses had bargained, and that in denying the site development plan, the City had deprived the Stephenses of the essential benefit of their bargain. The court also found that "the circumstances leading to the formation, development, and execution of the Settlement Agreement together with the City's actions prior to Mayor McClellan's appeal underscore the fact that the City understood it was obligated to approve development at a density of 140 units."

The court concluded that as a matter of law, the settlement agreement entitled the Stephenses to develop their property at a guaranteed density of 140 units. The court based this conclusion on the provisions of the

2. The Stephenses do not contend that these design conditions constitute a breach of the settlement agreement.

3. The district court denied the Stephenses' § 1983 claim against the City, stating "while it remains a close legal issue, the provisions of

Section 1983 do not convert every breach of contract claim into a federal case." The court also denied the § 1983 claim against Mayor McClellan holding that she had qualified immunity.

settlement agreement as a whole, the circumstances under which the settlement agreement was formed, and the actions of the parties subsequent to the execution of the settlement agreement and before Mayor McClellan's appeal of the approval of the site development plan.

The court permitted damages for the difference in the fair market value of the property with an entitlement and approved site development plan of 140 two bedroom units and the fair market value of the property in its "present state." The court found that the City would not have approved a site development plan for 128 two bedroom apartments as proposed by the City's expert, and concluded that the present feasible density of the property was 55 units (as testified to by the Stephenses' expert). The court agreed with the City's expert that the fair market value of the property with an entitlement of 140 units was $2,240,000 and found that the fair market value of the property with a feasible density of 55 units was $1,512,500. The court determined that this resulted in a diminution in value of $727,500 and awarded this sum as damages.

## G. City's Appeal

The City appealed the district court's judgment, contending that (1) as a municipality, it could not contract away its police powers and thus could not guarantee the Stephenses a development of 140 units, (2) by agreeing to rezone the property to R–M–30(Q), specifically with the Q overlay, it reserved its broad discretionary authority to review the site development plan, (3) the court erred in interpreting the agreement to guarantee the Stephenses a development of 140 units, and (4) the court erred in its award of damages by

finding that the feasible density of the property was 55 units.

## II.

## JURISDICTION

Although the jurisdictional issue in this case is a bit more difficult than is usual, we are satisfied that the district court had subject matter jurisdiction over the present controversy. See Latch v. United States, 842 F.2d 1031, 1032 (9th Cir.1988) (appellate court with an obligation to satisfy itself of its own jurisdiction and of the jurisdiction of the district court).

Jurisdiction to enforce the settlement agreement turns on jurisdiction in the district court over the original action. The question then is whether the district court had jurisdiction at that point.[4] Kohl Indus. Park Co. v. County of Rockland, 710 F.2d 895, 900 (2d Cir.1983); Fairfax Countywide Citizens Ass'n v. County of Fairfax, 571 F.2d 1299, 1303 (4th Cir.) cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978); see also Dacanay v. Mendoza, 573 F.2d 1075, 1078 (9th Cir.1978) (court has inherent authority to enforce a settlement agreement with respect to an action pending before it).

The Stephenses' initial complaint against the City alleged inverse condemnation and violations of their civil and constitutional rights based on the lowering of the primary access street and the down-zoning of their property. These claims were substantial and not frivolous, and thus the district court had jurisdiction over them.[5]

---

4. Since the settlement agreement was approved by the court and made part of the judgment, we need not decide whether the Stephenses' § 1983 claim based on the breach of the settlement agreement provides an independent ground for subject matter jurisdiction. See San Bernardino Physicians' Serv. Medical Group, Inc. v. County of San Bernardino, 825 F.2d 1404, 1407–08 (9th Cir.1987) (contractual rights may create a claim under § 1983, but § 1983 does not convert every breach of contract claim against a state into a federal claim).

5. See Hoehne v. County of San Benito, 870 F.2d 529, 531 (9th Cir.1989) (district court had jurisdiction under 28 U.S.C. § 1343 over suit for inverse condemnation and violation of constitutional rights arising from the denial of a subdivision plan); MacLeod v. County of Santa Clara, 749 F.2d 541, 544 n. 5 (9th Cir.1984) ("An action for inverse condemnation is cognizable under 42 U.S.C. § 1983."), cert. denied, 472 U.S. 1009, 105 S.Ct. 2705, 86 L.Ed.2d 721 (1985); Shamrock Dev. Co. v. City of Concord, 656 F.2d 1380, 1384 (9th Cir.1981) (district court had subject matter jurisdiction over claim for inverse condemnation).

Accordingly, the district court had jurisdiction to enforce the settlement agreement.[6] We have jurisdiction over this appeal under 28 U.S.C. § 1291.

## III.

### STANDARDS OF REVIEW

▇ The district court's findings of fact are reviewed under the clearly erroneous standard, while its conclusions of law are reviewed de novo. *Rozay's Transfer v. Local Freight Drivers*, 850 F.2d 1321, 1326–27 (9th Cir.1988), *cert. denied*, 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989).

When the interpretation of a contract includes review of factual extrinsic evidence, the findings of fact are reviewed for clear error, and the principles of law applied to those facts are reviewed de novo. *L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 221 (9th Cir.1989); *see also Kern Oil & Ref. Co. v. Tenneco Oil Co.*, 840 F.2d 730, 736 (9th Cir.) (when the inquiry focuses on extrinsic evidence of related facts, trial court's conclusions will not be reversed unless clearly erroneous), *cert. denied*, 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988). The district court's computation of damages is a finding of fact reviewed under the clearly erroneous standard. *Lum v. City and County of Honolulu*, 963 F.2d 1167, 1170 (9th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 659, 121 L.Ed.2d 585 (1992).

## IV.

### DISCUSSION

A. *Contracting Away the City's Police Powers*

▇ The City contends that the property's designation, R–M–30(Q), permitted development of a maximum of 140 units, but that the City's inherent police power imposed upon it a duty to exercise its discretion during the site development review or "Q overlay" process. The City maintains that because it cannot contract away its land use police pow-

er, the district court erred in ruling that the settlement agreement entitled the Stephenses to develop the property at a guaranteed density of 140 units. The City overstates an otherwise valid principle.

▇ It is correct that, broadly speaking, a municipality may not contract away its legislative and governmental functions. *Morrison Homes Corp. v. City of Pleasanton*, 58 Cal.App.3d 724, 734, 130 Cal.Rptr. 196 (1976). To contend otherwise is to suggest that the powers of municipal government may be bargained and sold. That is, the rule applies "to void only a contract which amounts to a city's 'surrender,' or 'abnegation,' of its *control* of a properly municipal function." *Id.* (emphasis in original).

In *Morrison*, the city had entered into a series of annexation agreements with a developer in which the city agreed to commit sufficient sewer capacity and to provide new sewer connections to homes built on the annexed lands. *Id.* at 729–30, 130 Cal.Rptr. 196. The city's treatment plant became overloaded, and the city discontinued making new sewer connections available. *Id.* at 731, 130 Cal.Rptr. 196. The developer sued, and the city asserted that the annexation agreements, and the sewer commitments in particular, were unenforceable because they were an invalid attempt to contract away the city's governmental functions. *Id.* at 733, 130 Cal. Rptr. 196. The court agreed that the operation of a municipal sewer system was a governmental function. *Id.*

However, it concluded that no provision in the annexation agreements amounted to a surrender of the city's control of its sewer operation. *Id.* at 734, 130 Cal.Rptr. 196. Similarly, we conclude here that the City could have contracted with the Stephenses for a guaranteed density of 140 units and exercised its discretion in the site development or Q overlay process without surrendering control of its land use authority.

---

**6.** Although abstention in the Stephenses' initial action may have been advisable and within the discretion of the district court under *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), we do not hold at this stage in the litigation that it was an abuse of discretion to retain the action. *See Shamrock*, 656 F.2d at 1385 (abstention was advisable in action for inverse condemnation, but it was not an abuse of discretion to decline to abstain).

The Q overlay is essentially a design review procedure. It was adopted to streamline the former "potential zoning" process that had been used. The potential zoning process consisted of two cycles, the first when the property was rezoned from its lower zone to a new "potential zone," the second when the zone became effective through the "Specific Plan of Design" procedure. Notices were given for each of the two cycles. Under the Q overlay process, however, notices would be given when the property was rezoned, but would not be given for "the Design Review." In enacting the Q overlay, the City Planning staff noted that "the historical record of the Council has recognized that the potential zone is a vested right and that the purpose of Specific Plan of Design is design control and not land use scrutiny."

Thus, the City could have guaranteed the Stephenses 140 units, and still exercised its discretion in the Q overlay process to review the design features of the development without surrendering control of its land use power.[7]

### B. *Effect of Reservation of Authority to Employ Q Overlay*

■ The City maintains that the Q overlay gave it broad discretion to review any proposed site development plan, and that by agreeing to rezone the property to R–M–30(Q), it reserved its authority to subject the Stephenses to standards that would affect the density of the property. Thus, the City argues that the trial court erred in ruling that the City had guaranteed the Stephenses a development of 140 units.

We disagree. The City has overestimated the significance of the Q overlay review process and its role therein. As discussed in Section IV.A., above, the Q overlay was implemented as a design review mechanism. Therefore, the City could have exercised discretion in reviewing the project's design while still guaranteeing a density of 140 units.

### C. *The Court's Interpretation of the Settlement Agreement*

■ The district court, based on the provisions of the settlement agreement as a whole, the circumstances under which the settlement agreement was formed, and the actions of the parties subsequent to the execution of the settlement agreement and before Mayor McClellan's appeal of the approval of the site development plan, concluded that the settlement agreement guaranteed the Stephenses a development density of 140 units. The City contends this conclusion was in error because the plain language of the agreement provided only for "a maximum of 140 units" and that under California law, the court may not imply contract terms which are contrary to the express terms of the written agreement. We do not agree with the City's contention.

■ California has a permissive approach to the admission of extrinsic evidence in contract interpretation. *Barris Indus. v. Worldivision Enter.*, 875 F.2d 1446, 1450 (9th Cir.1989). Extrinsic evidence may be admitted if relevant to prove a meaning to which the contractual language is reasonably susceptible. *Id.* Moreover, even if a contract appears clear on its face, "the court is re-

---

**7.** Although the City relies on *Pardee Constr. Co. v. City of Camarillo*, 37 Cal.3d 465, 208 Cal.Rptr. 228, 690 P.2d 701 (1984), this case is not analogous or helpful to the City. In *Pardee*, a developer and city entered into a stipulated judgment in which the city was estopped from adopting any zoning or land use regulations which were inconsistent with the developer's master plan and the zoning ordinance adopted in accordance with the plan. The city reserved its police power to adopt any ordinances that were not inconsistent with the stipulated judgment. *Id.* at 468, 208 Cal.Rptr. 228, 690 P.2d 701. The voters later adopted a growth control ordinance which limited the number of residential units that could be built each year. The developer sued the city

arguing that the ordinance could not be applied to the property that was the subject of the stipulated judgment. *Id.* at 470–71, 208 Cal.Rptr. 228, 690 P.2d 701. The court held that the ordinance did not infringe upon any of the developer's rights contained in the stipulated judgment; it did not rule on whether the judgment violated the city's authority to exercise its police power. *Id.* at 473, 208 Cal.Rptr. 228, 690 P.2d 701. Moreover, the court noted that the judgment granted the developer the right to develop the property in accordance with the master plan, and that the city was estopped from adopting zoning or land use regulations which were inconsistent with the plan. *Id.* at 472, 208 Cal.Rptr. 228, 690 P.2d 701.

quired to engage in preliminary consideration of extrinsic evidence to see whether it creates an ambiguity." *Id.* Here, there is evidence that the Stephenses bargained for a development density of 140 units; moreover, the settlement agreement called for rezoning which would allow 140 units and provided that the City's obligations did not end with the rezoning, but that the City's approval of a specific plan "shall create and constitute a binding and continuous obligation of the City with respect to the development of [the subject property]." Under these circumstances, an entitlement of 140 units was a reasonably susceptible meaning of the language of the settlement agreement; thus, the district court was permitted to admit extrinsic evidence in interpreting the agreement.

In examining the extrinsic evidence, the court found that a guaranteed density of a 140 unit development was the principal consideration for which the Stephenses bargained, and that the City understood it was obligated to approve a development at a density of 140 units. These findings are supported by the testimony of the Stephenses and various city officials and by the City's actions prior to the Mayor's appeal, and are not clearly erroneous. Therefore, we conclude that the district court did not err when it held that the settlement agreement entitled the Stephenses to develop the property at a guaranteed density of 140 units.

## D. *Damages*

■ The court awarded $727,500 in damages based on the difference between the value of the property with an entitlement of 140 units and the value of the property with a developable density of 55 units. It appears that 55 units represents the number of units that the district court concluded a new purchaser of the land could expect to have approved. It does not appear to be the number that the court concluded the City would have approved after imposing the eleven conditions on the Stephenses' site development plan.

■ Damages for breach of contract are supposed to compensate for the detriment caused by the breach. *See* Cal.Civ.Code § 3300 (West 1970). The City breached the settlement agreement by imposing 11 conditions on the building plan, which would have reduced the density of units to a number below 140. As a general proposition, therefore, the number of units below 140 that could have been built in compliance with the 11 conditions should have been the number used to calculate damages.

In this case, however, the City maintained that the settlement agreement did not impose upon it an obligation to approve *any* fixed number of units. In light of the City's position, the district court's measure of damages was appropriate. As the City did not feel obligated to approve the maximum number of units that could be built in compliance with the 11 conditions, the district court did not clearly err in relying upon the number of units that a new buyer could expect to have approved, absent any agreement.

The determination that 55 units represents the feasible developable density of the property is not clearly erroneous. This figure is supported by the testimony of the Stephenses' expert during the damage phase of the trial. Moreover, when the property was rezoned prior to the original suit, that zoning classification provided for approximately 50 units. Finally, although a city council member testified at trial that he would have approved a 128–132 unit plan, that same council member stated at the September 28, 1987 City Council hearing that he thought "37 lots and 11 apartments" were all that should go on the property. Therefore, we conclude that the district court's calculation of damages is not clearly erroneous.

AFFIRMED.