66 F.3d 334
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
EVENT ENTERTAINMENT, INC.; Richard Kulis; Judy Kulis,
Plaintiffs-Appellants,
v.
HOME SHOPPING NETWORK COMMUNICATIONS, INC.; Home Shopping
Center Network, Inc., Defendants-Appellees.
 No. 94-55238.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 7, 1995.
Decided Aug. 31, 1995.
 
 Before: THOMPSON, LEAVY and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Event Entertainment, Inc. and its sole principals, Richard and Judy Kulis (the Kulises), appeal the district court's summary judgment in favor of Home Shopping Network, Inc. (HSN) in their diversity action for breach of a written contract for the production of three sporting events to be aired on pay-per-view and cable television. Relying on a damages limitation provision, the district court held that the Kulises were only entitled to 25% of the profits from the events. Because the events were never produced, no profits were made, and thus, the district court concluded the Kulises had no remedy and therefore no claim. The district court also rejected the Kulises' claim that HSN breached the implied covenant of good faith and fair dealing by denying the existence of the contract.
 
 
 3
 We reverse in part and remand. The damages limitation provision applied only if the Kulises were fired after the events were in place. The contract was silent as to what damages might be due if HSN fired the Kulises before the events were produced. We, therefore, reverse the district court's summary judgment, except for its determination that the Kulises failed to establish a genuine issue of material fact that HSN denied the existence of the contract.
 
 FACTS
 
 4
 In November 1991, the Kulises negotiated with HSN to produce three sporting events: (1) a post-season NCAA collegiate football championship game; (2) a professional baseball home run derby; and (3) a professional "battle of the sexes" tennis match.
 
 
 5
 On November 25, 1991, HSN sent the Kulises a letter outlining the terms of their oral agreement. The Kulises would close their existing business to work for an HSN subsidiary to produce the sporting events. The Kulises would receive salaries of $200,000 per year each and 25% of any net profits from the events. HSN also agreed to give the Kulises five-year stock options and to repay their outstanding business loans.
 
 
 6
 A termination provision was the subject of extended negotiation and correspondence by the parties and their counsel. Finally, on December 13, 1991, HSN sent the Kulises a letter which provided that:
 
 
 7
 in the event of [your] involuntary termination of employment ... during the term that the arrangements made by you with the NCAA for the collegiate bowl remain in effect substantially in accordance with your written proposal discussed with HSN on November 15, your sole compensation would be twenty five percent of [HSN's net profits from the events].
 
 
 8
 ....
 
 
 9
 There will be no compensation to you if you are involuntarily terminated except as outlined above with respect to any or all of the three described events.
 
 
 10
 Approximately two weeks later, HSN terminated the agreement. The Kulises brought suit against HSN one year later, alleging claims for breach of contract, bad faith denial of the existence of the contract, breach of the covenant of good faith and fair dealing, and declaratory relief. The district court granted HSN's motion for summary judgment, and this appeal followed.
 
 DISCUSSION
 
 11
 The Kulises contend their contract with HSN is ambiguous. According to them, parol evidence would establish that the contract contained an implied covenant that HSN could not fire them until after contracts for the three events were in place, or at a minimum they had been given a reasonable opportunity to produce the events. According to the Kulises when HSN fired them it breached the contract.
 
 
 12
 In rejecting this argument, the district court held that the Kulises' damages were limited to 25% of the profits from the events. Because the events were not produced, there were no profits to split, and the Kulises had no remedy, and therefore no claim.
 
 
 13
 Before reaching the damages issue, the district court should have considered whether the contract contained the implied covenant as the Kulises contended. In deciding this question, the district court should have examined any relevant extrinsic evidence to see if the contract is susceptible of the Kulises' interpretation.
 
 
 14
 California courts take a "permissive approach to extrinsic evidence in contract interpretation." Barris Indus., Inc. v. Worldvision Enterps., Inc., 875 F.2d 1446, 1450 (9th Cir.1989). "Under California law, '[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible." Id. (quoting Pacific Gas and Electric Co. v. G.W. Thomas Drayage and Rigging Co., 69 Cal.Rptr. 561, 564 (1968)).
 
 
 15
 Thus, even if a contract appears to be absolutely clear on its face, the court is required to engage in preliminary consideration of extrinsic evidence to see whether it creates an ambiguity. However, if the extrinsic evidence advances an interpretation to which the contract is not reasonably susceptible, the extrinsic evidence is not admissible.
 
 
 16
 Id.
 
 
 17
 Only after considering whether the contract contains an implied covenant of good faith and fair dealing as the Kulises contend, and whether if it does, HSN breached that covenant, may the district court consider the damages aspect of the case. Contrary to the district court's holding, the Kulises' damages are not limited to 25% of post-production profits. By its terms, this damages provision would apply only if the Kulises were fired "during the term that the arrangements made by [them] with the NCAA for the collegiate bowl remain in effect," that is, post-production. The contract is silent as to what damages HSN might owe the Kulises for firing them before the events were produced.
 
 
 18
 Pre-production damages are not precluded by the December 13, 1991 letter. This letter provides in part: "There will be no compensation to you if you are involuntarily terminated except as outlined above with respect to any or all of the three described events." Given the context in which this language appears, it would only limit post-production damages (unless extrinsic evidence should show that the language means something else).
 
 
 19
 With regard to the Kulises' claim that HSN breached the implied covenant of good faith and fair dealing by denying the existence of the contract, we agree with the district court. The Kulises failed to establish a genuine issue of material fact on an essential element of this claim--that HSN denied the existence of the contract. See Seaman's Direct Buying Service, Inc. v. Standard Oil Co., 36 Cal.3d 752, 759 (1984).
 
 
 20
 AFFIRMED in part, REVERSED in part, and REMANDED to the district court for further proceedings consistent with this disposition.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3