**In re Martin M. SCHULTZ, an individual, Debtor and Debtor-in-possession, Debtor.**

**Martin M. Schultz, an individual, Plaintiff,**

**v.**

**Union Bank of California, N.A., successor-in-interest to Union Bank, a California corporation, Defendant.**

Bankruptcy No. LA96–47832–TD.
Adversary No. AD 98–01453–TD.

United States Bankruptcy Court,
C.D. California.

Feb. 25, 1999.

John Z. Shafai, Gilburg & Shafai, Los Angeles, CA, for debtor.

FINDINGS OF FACT AND CONCLU-SIONS OF LAW AND ORDER GRANTING AND DENYING SUM-MARY ADJUDICATION OF IS-SUES AND GRANTING SUMMARY JUDGMENT

THOMAS B. DONOVAN, Bankruptcy Judge.

The cross-motions of defendant Union Bank of California, N.A. (Union Bank), and plaintiff Martin M. Schultz (Schultz) for summary judgment, and, alternatively, for summary adjudication were heard on December 17, 1998, and February 11, 1999. Sulmeyer Kupetz Baumann & Rothman, by Alan G. Tippie and Donald Rothman, and James A. Frieden appeared for Schultz. Pillsbury Madison & Sutro LLP, by Robert L. Morrison and Leanna B. Einbinder, appeared for Union Bank.

The court read and considered the cross-motions and all papers in support and opposition. At the hearings, the court heard and considered the argument of counsel. The court also heard and considered the argument of counsel at a prior hearing regarding the cross-motions, held on December 9, 1998. The court, being fully informed of the issues presented to it for decision, makes the following findings of material facts without substantial controversy and conclusions of law:

### FINDINGS OF MATERIAL FACTS WITHOUT SUBSTANTIAL CONTROVERSY

1. This is a lawsuit about a lawsuit about another lawsuit.

*A Brief Outline Of The Background Of This Dispute*[1]

2. The earliest lawsuit, which I will call the Fulton Litigation, began in 1984. The Fulton Litigation developed as follows: Commencing around 1982, Union Bank entered into a series of agreements with Fulton Associates relating to certain promissory notes executed by Fulton Associates, and the bank acquired certain interests in these promissory notes. Commencing about 1984, Fulton Associates filed complaints against Union Bank and other parties relating to the promissory notes described above. Two of these were filed in the Los Angeles Superior Court and were entitled *Fulton Associates, et al. v. SMC Real Corp., et al.*, Los Angeles Superior Court, Nos. C 547248 and C 554554. Around 1987, a cross-complaint was filed naming Union Bank and Schultz as cross-complainants in the action described above. The Fulton Litigation ended in a judgment in favor of Schultz in 1996. That judgment is now final as to all parties except Schultz. Schultz just recently has sought and obtained relief from stay to prosecute his defense of the judgment debtor's appeal from the Fulton Litigation judgment in Schultz' favor.

3. The second lawsuit, referred to herein as the State Court Litigation, was

---

1. These headings are included simply as a guide and do not constitute part of the following findings and conclusions. They are not intended to be a complete outline of the issues discussed.

filed in 1991 by Union Bank against Schultz in the Los Angeles Superior Court, No. BC 042505. Schultz filed a cross-complaint against Union Bank. Trial began in late 1996.

4. Schultz filed his chapter 11 petition *pro se* on November 14, 1996, and I granted Schultz' motion for relief from stay shortly after to enable the parties to continue prosecuting the State Court Litigation.

5. In his Interim Statement of Decision, issued on February 18, 1997, after the liability phase of the trial, Judge Peter Smith (a retired superior court judge sitting as a referee), concluded that Union Bank was entitled to no recovery and that Schultz was entitled to prevail on his cross-complaint against Union Bank on Schultz' claims for rescission, fraud, breach of an implied covenant of good faith and fair dealing, breach of oral and written agreements and cancellation of a $400,000 note secured by a deed of trust on Schultz' home.

6. Pursuant to a Confidential Settlement Agreement (CSA) between Schultz and Union Bank, dated April 7, 1997 (that I reviewed and approved later that month, after a hearing conducted in camera), the rights and obligations of Schultz and Union Bank in the State Court Litigation were partially settled. The agreement was treated as confidential at the parties' request because they wanted to prosecute their claims in the State Court Litigation to a Final Judgment after all appeals without alerting the judges involved to the terms of the settlement. The parties agreed in the CSA that the "damages phase" of the State Court Litigation could proceed to a "Final Judgment" after all appeals, pursuant to agreed procedures.

7. In October 1997, Judge Smith in his Final Decision awarded Schultz substantial damages and confirmed Schultz' right to rescind an Assignment, Indemnity and Se-curity Agreement (AISA) with Union Bank. The AISA apparently was associated with Schultz' involvement with Fulton Associates.

8. The third lawsuit now before this court was filed by Schultz against Union Bank in 1998, after I approved the CSA, and after Judge Smith's Final Decision awarding damages and rescission to Schultz, but prior to the Final Judgment in the State Court Litigation. In this third lawsuit, Schultz sought declaratory relief, rescission of the CSA, restitution, compensatory and punitive damages, attorneys' fees and costs. Union Bank in response did not assert any claims for affirmative relief but asked for an award of attorneys' fees and costs.

9. Schultz and Union Bank have filed cross-motions for summary judgment and for summary adjudication. Those motions have been exhaustively briefed, documented and argued. I announced oral rulings at hearings on December 17, 1998 and February 11, 1999. These findings and conclusions are intended to document most of those rulings and to modify my ruling as to the "prevailing party" issue. Evidentiary rulings that were announced on December 17 are documented in a separate order.

### The Origins Of The Confidential Settlement Agreement

10. The precipitating factor in the filing of Schultz' bankruptcy was the prospective foreclosure on Schultz' home by First Federal Savings & Loan, the first trust deed holder. Shortly after Schultz' chapter 11 petition was filed, First Federal moved for relief from stay. At the time, Schultz did not have the funds to bring the first trust deed current. I granted relief from stay to First Federal but allowed Schultz until February 19, 1997 to cure the First Federal arrearages.

11. During the liability phase of the State Court Litigation, Schultz informed

Judge Smith of his financial predicament in papers opposing a request by Union Bank for a continuance. On February 18, 1997, the day before the scheduled foreclosure sale of Schultz' home by First Federal, Judge Smith entered his Interim Statement of Decision finding that Union Bank was liable to Schultz for compensatory and punitive damages for fraud, breach of fiduciary duty and breach of contract and that Schultz was entitled to rescind the AISA.

12. Based upon Judge Smith's Interim Statement of Decision, I granted Schultz additional time to bring the payments on the First Federal trust deed current and thereby save his home from foreclosure. However, I required Schultz to pay all the arrearages to First Federal by May 20, 1997. As of March 5, 1997, the arrearages were $83,077.95.

13. In March 1997, all of Schultz' funding sources had fallen through and Schultz considered that the only possibility of saving his home rested on the possibility of a settlement with Union Bank.

14. With Schultz facing foreclosure and with Union Bank facing the damages phase of the State Court Litigation and the prospect of being subject to a substantial damage award, the parties began to negotiate a settlement in March 1997.

15. In these settlement discussions, Union Bank was represented by Pillsbury, Madison & Sutro. Schultz was represented by Frieden and Dunne, two sole practitioners.

16. Dunne took the leading role in negotiating the settlement agreement for Schultz. Frieden concentrated on preparing the damages phase of the state court trial. Chiate of the Pillsbury firm and Polkinghorn (assistant general counsel for Union Bank) negotiated for Union Bank. The negotiations were hurried.

17. After preliminary discussions, Chiate wrote to Dunne in March of 1997 laying out the terms of a settlement proposal. The letter states, in relevant part that:

> Following consummation of the agreement, which will be confidential and not disclosed to the [state] court, the Bank will pay Schultz $3 million. That amount is non-refundable regardless of the outcome of the case.

> If Peter Smith (or successor referee or judge) ultimately awards Schultz *more* that $9 million, including fees, costs interest, and final judgment, and this amount is affirmed on appeal the Bank will pay him an additional $1 million in cash, and provide him an annuity of $300,000 per year, guaranteed for 20 years, the first annual payment to commence one year after the annuity is purchased.

> If the final judgment on appeal is *less* than $9 million, then Schultz will receive from the Bank the difference between the $3 million already paid and the amount of the final judgment.

18. Later the same day Chiate wrote to Dunne confirming additional conversations, including the following:

> Whatever the "Tobias" amount is, we have not included or excluded that from negotiations, neither of us have agreed to how it would be included or excluded from this agreement....

19. "Tobias" referred to about $300,000 then held in an escrow account subject to a lien held by Schultz arising from the Fulton Litigation. These funds are discussed below and apparently have been referred to by the parties as the "Tobias II Funds."

20. The first draft of the settlement agreement was produced on April 3, 1997, by Union Bank's attorneys from Chiate's correspondence with Dunne. Dunne and Frieden sent comments, many of which were not adopted by Union Bank's attorneys but some of which were.

21. On April 4, 1997, Goss, a Pillsbury lawyer, wrote to Dunne stating:

We enclose two version[s] of the CONFIDENTIAL SETTLEMENT AGREEMENT ("Agreement") between Union Bank and Mr. Schultz. The first Agreement is a clean copy which reflects the changes you recently conveyed to Ken Chiate, with some minor additional editorial changes. For ease of reference, the second Agreement is the handwritten "red-lined" version. The underlined portion represents your suggested changes. The bracketed portion represents the editorial changes.

We hope that the Agreement is now acceptable and ready for signature by you and Mr. Schultz. Please return an executed copy of the Agreement by facsimile to me as so[o]n as possible. We would appreciate you sending the original by mail today.

22. On the same day, April 4, 1997, Dunne faxed to Chiate a copy of the agreement. The parties were still tinkering with the agreement and further changes were made, but none of those changes are relevant to the issues in this adversary proceeding.

23. Union Bank meanwhile was attempting to disqualify Judge Smith from further participation in the State Court Litigation. Schultz' attorney confirmed in a letter dated April 6, 1997 Schultz' awareness of the bank's disqualification efforts and the parties' understanding that even if Union Bank were successful in disqualifying Judge Smith, Schultz would not have to wait to receive the unrestricted use of the initial $3 million payment from Union Bank. Schultz did not ask Union Bank to stop the disqualification process as a condition to the effectiveness and validity of the CSA. Ultimately, Union Bank's disqualification effort failed.

24. A true and correct copy of the final executed CSA, dated April 7, 1997, is attached as Exhibit 1 to Schultz' Second Amended Complaint herein.

25. Pursuant to Paragraph 1 of the CSA, Union Bank paid Schultz $3 million shortly after I approved the CSA later in April 1997.

### Judge Smith's Final Decision

26. On September 16, 1997, Judge Smith issued his Statement of Decision (Exhibit 1) which the parties and I refer to as the "Final Decision". On September 18, 1997, Schultz elected to rescind the AISA. (Exhibit 18) On November 18, 1997, Judgment was entered in the State Court Litigation based upon Judge Smith's Final Decision. The Judgment voided Union Bank's $400,000 third trust deed on Schultz' home, acknowledged Schultz' rescission of the AISA, and awarded Schultz $1,119,183 in restitutionary damages, $11,960,046 in compensatory damages, and $18,000,000 in punitive damages. (Exhibit 27) Judge Smith's Final Decision awarded Union Bank as return consideration (i) title to an escrow account in the *Tobias II* bankruptcy of approximately $300,000.00 [the Tobias II Funds], (ii) the Fulton Associates Judgment in the amount of $998,074 plus any accrued interest and (iii) title to any remaining unpaid notes secured by the Chase property. Union Bank's motion for a new trial was denied. Attorneys' fees and costs were awarded to Schultz.

### The Appeal And Final Judgement

27. Union Bank appealed the Final Decision. Schultz elected a right accorded to him under the CSA to pursue the appeal with the use of privately employed judges. In the summer of 1998 the parties presented the State Court Litigation appeal to a panel consisting of retired California Supreme Court Chief Justice Malcolm Lucas, retired California Supreme Court Associate Justice Edward Panelli, and retired California Court of Appeal Justice Robert Feinerman. On October 6, 1998, the ap-

pellate panel rendered its decision, which the parties and I refer to as the "Final Judgment" (the language used in the CSA), (a) sustaining the compensatory damage award to Schultz and (b) reversing the $18,000,000 punitive damage award. The Final Judgment said in a concluding footnote that " . . . this opinion does not address or change any other damage award provided for in the trial court's judgment."

### Union Bank's Tender And Schultz' Rejection

28. Based on the Final Judgment, by letters to Schultz dated October 1 and October 7, 1998, Union Bank claimed that it had complied with all the duties and obligations imposed upon it by the CSA, whether based on the Final Judgment, the State Court Judgment or the CSA. Among other things, Union Bank delivered to Schultz with its letters (a) a cashier's check for $1,000,000 and (b) a reconveyance of the bank's deed of trust on Schultz' home and cancellation of the $400,000 note secured by the bank's deed of trust. The bank also agreed to pay $3,856,782.96 immediately to an insurance company or other financial institution nominated by Schultz. Union Bank asserted that such sum represented an appropriate premium for the purchase of the annuity called for by the CSA.

29. In response to Union Bank's letters, Schultz asserted that Union Bank was in material breach of the CSA and that Schultz thereby was discharged from any further obligation to Union Bank under the CSA.

30. The CSA provides that when all applicable appeals are exhausted, the parties will take any and all actions necessary to comply with paragraphs 2(a)–2(c) [of the CSA] (whichever is applicable) and to vacate any outstanding judgment against UNION BANK arising out of the [State

Court Litigation] action (Los Angeles Superior Court Case No. 042505).

31. In late 1998, after the Final Judgment was issued, the parties stipulated that the confidentiality provisions of the CSA were no longer necessary, and I rescinded my early 1997 order sealing various pleadings and records herein relating to the CSA.

### Some Of The Contractual Terms Disputed In This Adversary Proceeding

32. The term "annuity" as used in the CSA means an annual payment of money and is not reasonably susceptible to the meaning urged by Union Bank: an "annuity contract" that is sold by an insurance company or other annuity provider.

33. The term "provide" as used in the CSA in relation to the Union Bank annuity obligation is not reasonably susceptible to the meaning urged by Union Bank: that Union Bank has the option to substitute in place of its obligation the obligation of an insurance company or any other annuity provider and thereafter that Union Bank's annuity obligation to Schultz is discharged.

34. The CSA is not reasonably susceptible to the meaning urged by Schultz that subparagraph 2(a) of the CSA was included solely for the benefit of Schultz. Rather, once the Final Decision was rendered in the State Court Litigation between Schultz and Union Bank sustaining an award of compensatory damages of more than $9 million to Schultz, Schultz did not have the contractual right to elect a lump sum payment instead of an annuity. Schultz does not now have the unilateral right to waive subparagraph 2(a) and to elect instead to proceed under subparagraph 2(b) of the CSA.

35. After some earlier disagreement in this adversary proceeding, Schultz finally conceded that the first annuity payment under the CSA is to be made one year

after the Final Judgment is entered in the State Court Litigation. Moreover, the evidence confirms that the first annuity payment under the CSA becomes payable one year after a Final Judgment is entered.

*One Of The Problems Leading To The Present Dispute*

36. At the time of the negotiation of the CSA, in March and April 1997, the AISA between Union Bank and Schultz was in force. Schultz had prayed for the right to rescind the AISA in the State Court Litigation (see Judge Smith's Finding No. 5), but Schultz had not yet formally elected to rescind the AISA and was pursuing parallel fraud and breach of contract claims against Union Bank. Schultz owned the Fulton Judgment at that point. During 1997 and 1998, Schultz continued to pursue the Fulton Litigation, expending time and incurring substantial attorneys' fees. Union Bank also asserted its Fulton Litigation/AISA rights against Schultz.

37. During that period, Union Bank initially did not object to Schultz' collection or use of what the parties refer to as the "Tobias II Funds," but when Schultz rescinded the AISA after being allowed to do so in the State Court Litigation, Union Bank asserted the position that pursuant to the Final Judgment it thereby became the owner of the Tobias II Funds.

38. "Tobias II" refers to 9027 Tobias II, Ltd., a California limited partnership, the obligor on a secured note payable to Schultz in the face amount of $99,960 plus interest.

39. "Tobias" refers to a debtor in a 1982 chapter 11 case formally styled *In re SMC–9027 Tobias Ltd.*, Case No. SV82–06963GM which was dismissed in 1994. During the pendency of the 1982 *Tobias* chapter 11 case, the bankruptcy court on May 17, 1984 approved the sale of collateral securing a Tobias note and decreeing that the sales proceeds of that collateral, the so-called "Tobias II Funds", were to be held in trust in a deposit account subject to Schultz' lien, with the validity of that lien to be determined through the Fulton Litigation.

40. Throughout the Fulton Litigation, R. Wicks Stephens II and his firm of Stephens, Berg & Lasater (Stephens and the firm being referred to collectively hereinafter as "SBL") were Schultz' counsel of record.

41. In late 1992 or early 1993, Stephens and Schultz agreed that any Fulton Litigation recovery Schultz became entitled to would be paid to SBL to the extent necessary to pay SBL's accrued Fulton Litigation fees, costs and expenses incurred on Schultz' behalf.

42. On March 11, 1996, a Notice of Statement of Decision and Entry of Judgment was filed in the Fulton Litigation. Pursuant to the Statement of Decision (the Fulton Judgment), Schultz was awarded $1.2 million against Tobias and other entities and, among other things, the Tobias note was declared a valid obligation payable to Schultz. Thus, Schultz apparently was awarded the Tobias II Funds.

43. The Fulton Judgment later was supplemented by a minute order, that was entered on May 10, 1996. Pursuant to the minute order, Schultz was awarded attorneys' fees against Fulton Associates and Tobias, jointly and severally, in the amount of $625,000 and costs of $20,037.57. Although the Fulton Judgment has been appealed, no bond has been posted and no stay has been granted. The appeal was stayed as to Schultz pursuant to the automatic stay resulting from the filing of Schultz' bankruptcy case. As to all parties other than Schultz, the judgment has been affirmed and the judgment is now final. I signed an order on February 10, 1999 vacating the Schultz bankruptcy stay to enable Schultz to pursue the Fulton Litigation appeal process to its conclusion.

44. As a result of its pre-bankruptcy work for Schultz in the Fulton Litigation for which it has not been paid, SBL filed a $938,095.37 proof of claim in Schultz' chapter 11 case. On December 18, 1997, Schultz acknowledged in this court the validity, perfection, first priority and extent of SBL's attorneys' lien against the Tobias II Funds and affirmed his allowance of the amount asserted in SBL's proof of claim.

45. By an order entered on December 29, 1997, I granted relief from stay to SBL to foreclose its interest in Schultz' interest in the Tobias II Funds. Schultz spent considerable time and effort in December 1997 assisting SBL in its efforts to obtain this order for relief from the stay.

### Schultz' Claims Concerning The Fulton judgment, The Tobias II Funds And Delay

46. In December 1997, Schultz levied on the Tobias II Funds (coincidentally held in a bank account at Union Bank standing in the name of attorney Robert Bass), pursuant to a writ of execution issued in the Fulton Litigation. Lisa A. Elizondo was Union Bank's assistant vice president and legal process supervisor responsible for responding to Schultz' levy.

47. Until March 26, 1998, Elizondo was not aware of the dispute or litigation between Schultz and Union Bank.

48. Elizondo received the levy notice on the Bass account about December 30, 1997. Because the funds were held in a third party's name, Elizondo informed the sheriff that a 15–day notice to Mr. Bass was required under California law. The sheriff issued a third-party notice on January 15, 1998.

49. Elizondo processed the levy routinely and in accordance with Union Bank's normal procedures. Elizondo responded to the levy on January 12, 1998.

50. Before the 15–day third-party notice period to Bass had elapsed, Fulton Associates filed a motion to quash the writ of execution. Elizondo received Fulton Associate's motion on or about January 26, 1998 and considered at that time whether the funds should be released or should be held until the motion was ruled upon by the court.

51. On the expiration date for the third-party notice, an entity named 9027 Tobias II Ltd, herein called "Tobias II", filed a new chapter 11 petition, Case No. LA98–13778AA, automatically staying Schultz' levy and thereby precluding Union Bank from turninq over the Tobias II Funds.

52. On February 26, 1998, Tobias also filed a motion to reopen its 1982 bankruptcy case.

53. The new *Tobias II* bankruptcy was dismissed on March 13, 1998.

54. On about March 17, 1998, Elizondo received notice of the dismissal of the *Tobias II* bankruptcy case and Union Bank informed the sheriff that Union Bank needed a third-party demand from the sheriff before it could deliver funds pursuant to the pending levy.

55. The sheriff's office served the third-party demand on March 24, 1998.

56. On March 30, 1998, Elizondo issued instructions to have the funds in the account transferred to Schultz as directed by the levy.

57. On April 1, 1998, Elizondo had Union Bank prepare a cashier's check for $313,821.36, and caused it to be sent to the sheriff.

58. Schultz' estate had $1,650,217.70 in cash on hand as of April 2, 1998.

59. Schultz also filed pleadings in December 1997 in his bankruptcy case in an apparent effort to assist his secured creditor SBL to obtain relief from the automatic stay so that SBL, as a secured creditor

claiming a first priority lien on the Tobias II Funds, could exercise its rights against those funds. In those pleadings Schultz conceded "that he does not have any equity in the Tobias Proceeds pursuant to 11 U.S.C. Section 362(d)(2)(A), and that the Tobias Proceeds are not necessary to an effective [Schultz] reorganization pursuant to 11 U.S.C. Section 362(d)(2)(B)."

60. Schultz paid SBL in April 1998 with general funds, not by assigning to SBL the Tobias II Funds levied upon by Schultz. Schultz paid $316,796.36 to SBL in return for a release of SBL's attorneys' lien on the Tobias II Funds. The Tobias II Funds levied upon by Schultz were collected by Schultz after Schultz paid SBL.

61. While Schultz blamed his delay in obtaining a writ of execution on lack of funds to employ counsel, Schultz had access to sufficient funds for that purpose as early as September 1997.

62. Though Schultz obtained relief from the stay for SBL, Schultz, not SBL, was the party that levied on and ultimately collected the Tobias II Funds.

63. Any delays encountered by Schultz in collecting the Tobias II Funds were not caused by Union Bank.

64. Under the CSA, Union Bank and Schultz were expressly accorded the "right to complete the [State Court] litigation of the action to a final conclusion."

65. One of the purposes of the CSA was "to resolve … the issue of the minimum and maximum amount Schultz can recover in this [State Court] Action." The parties considered it to be in their best interest and to their mutual advantage to enter into the CSA and "to settle, adjust and compromise all such matters and all such existing or potential disputes, while giving the parties the right to complete the [State Court] litigation of the action to a final conclusion." The term "Action" in the CSA refers specifically to the State Court Litigation. The term "Action" does not refer to or include in any way the Fulton Litigation.

66. The CSA does not refer to the Fulton Judgment or Tobias II Funds. The CSA alludes to the Fulton Litigation in its opening recitals, apparently solely to put the State Court Litigation in context.

67. After affirming the $11,960,046 compensatory damage award to Schultz and reversing the $18,000,000 punitive damage award, the State Court Litigation Final Judgment expressly states that "this opinion does not address or change any other damage award provided for in the trial court's judgment." Thus, the parties' interests in the Tobias II Funds and the Fulton Judgment were resolved in the Final Judgment.

68. In light of the foregoing, and based on a careful reading of the CSA, it would appear that the parties' rights with respect to the Tobias II Funds, the Fulton Judgment and restitutionary damages in this adversary proceeding are offsetting, notwithstanding the CSA's limit on Schultz' maximum recovery. That is, Union Bank would not seem to be entitled to any recovery from Schultz except upon the condition that it makes the restitution to Schultz specified in the State Court Litigation Final Decision, Judgment and Final Judgment, over and above any other consideration called for or limited in the CSA.

69. Union Bank conceded that the issue of the $400,000 note, while not addressed in the CSA, was rendered moot by the Final Judgment which did not disturb that part of the Judgment in the State Court Litigation offsetting the $400,000 note against compensatory damages awarded to Schultz.

70. Union Bank has provided Schultz with a deed of reconveyance that cancels its deed of trust on Schultz' home and has

canceled Schultz' $400,000 note payable to Union Bank.

Any of the above findings that more appropriately should be treated as a conclusion of law is hereby incorporated by reference in the following conclusions.

Based on the foregoing Material Facts Without Substantial Controversy, the court now makes the following conclusions of law:

## CONCLUSIONS OF LAW

### The Parol Evidence Rule And The CSA

1. The "parol evidence rule" in many of its permutations has been asserted by the parties on these motions. The parol evidence assertions cut both ways as to both parties under California law applicable in this adversary proceeding. The following principles have guided my evaluation of the parol evidence assertions:

■ a. First, parol evidence is appropriate to explain the surrounding circumstances and prior negotiations leading to the CSA, to explain terms implied by law, and to determine whether the CSA was intended to be an integrated agreement. I conclude that parol evidence is admissible for those purposes and that paragraphs 11 and 15 of the CSA establish that the parties intended an integrated agreement.

■ b. Second, parol evidence is inadmissible to vary the terms of the integrated agreement. Union Bank's proffered evidence that the annuity obligation was intended to be satisfied by a contract purchased from an insurance company varies the terms of the CSA. The parties did not reach agreement on that point in the CSA. Thus, the bank's evidence should be excluded. By the same token, Schultz' proffered evidence that the payment date on the first annuity installment was the result of "scrivener's error" varies the terms of the CSA. The parties did not reach agreement on the point asserted by Schultz. Schultz' evidence should be excluded.

■ c. Third, evidence of fraud, mistake, lack of consideration or to explain ambiguities in the CSA should not be excluded. I have not excluded such evidence from my evaluation of the record. My findings and conclusions, I believe, reflect a proper consideration of the parties' proffered evidence on each such issue.

2. The CSA is an integrated, feasible and enforceable contract.

■ 3. Union Bank is obligated to make the annuity payments pursuant to the CSA. If Union Bank should elect to provide those payments through an annuity contract purchased from a third party, Union Bank would remain responsible for the payments to Schultz for the entire term of the annuity. I have considered all the evidence proffered by Union Bank to support an interpretation of the CSA that allows it to purchase an annuity contract from a third party and thereby discharge its annuity obligation to Schultz. Because I find the CSA to be an integrated agreement that is not reasonably susceptible to such an interpretation, the extrinsic evidence introduced by Union Bank is inadmissible pursuant to the parol evidence rule. *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 39–40, 69 Cal.Rptr. 561, 442 P.2d 641 (1968); *Winet v. Price*, 4 Cal.App.4th 1159, 1165, 6 Cal.Rptr.2d 554 (1992).

■ 4. The CSA does not permit Schultz to waive the benefits of the annuity pursuant to CSA subparagraph 2(a) and elect to receive from Union Bank a lump sum payment under CSA subparagraph 2(b). I have considered all the evidence proffered by Schultz to support his contention that the CSA permits him to make such an election. Because I find the CSA to be an integrated agreement that is not

reasonably susceptible to such an interpretation, the extrinsic evidence introduced by Schultz is inadmissible pursuant to the parol evidence rule. *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 39–40, 69 Cal.Rptr. 561, 442 P.2d 641 (1968); *Winet v. Price*, 4 Cal.App.4th 1159, 1165, 6 Cal.Rptr.2d 554 (1992).

■ 5. Schultz is not entitled to rescind the CSA. Schultz' belief that he was entitled to elect the lump sum payment in lieu of the annuity does not constitute a mistake under either Civil Code Section 1577 or 1578 and is therefore not grounds for setting aside the contractual obligations under the CSA. *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal.App.4th 1410, 1418–21, 49 Cal.Rptr.2d 191 (1996); B.E. Witkin, *Summary of California Law*, Vol. 1, Contracts §§ 370, 379 (9th ed.1987), and *Supplement* thereto.

■ 6. The first annuity payment under the CSA is not due or payable until one year after entry of the Final Judgment. The annuity payment commencement date is integral to the CSA. The date set forth in the CSA is not the result of "a scrivener's error" as asserted by Schultz. Schultz' proffered evidence to support his assertion of scrivener's error is inadmissible because such evidence would vary an unambiguous term of the CSA.

### Breach Of Contract

■ 7. Although Union Bank described its tender of performance in early October 1998 as "unconditional", and while the bank's tender did not fully satisfy the requirements of the CSA, these shortfalls in its performance do not constitute a material breach of the CSA under the circumstances of this adversary proceeding, for the following reasons:

a. First, a breach of the sort asserted by Schultz occurs only if the obligor's performance is presently due. Here, Union Bank tendered performance on its annuity obligation in October 1998, while the first installment of the annuity was not due or payable under the CSA until one year after the October 1998 entry of the Final Judgment in the State Court Litigation.

b. Under the circumstances of this adversary proceeding initiated by Schultz six months before the Final Judgment was issued, Union Bank's conduct constituted, at worst, an anticipatory breach. In this case, the alleged anticipatory breach occurred after Schultz sued Union Bank asserting claims based on Schultz' unilateral interpretation of the CSA. Schultz' complaint in this adversary proceeding might be said to have provoked Union Bank into resisting by asserting in response its unilateral interpretation of the CSA. Since the time for performance by making the first annuity payment had not arrived when Schultz' adversary complaint was filed, in effect both sides reasonably anticipated that their conduct and legal positions would be subject to this court's scrutiny and determination in response to Schultz' adversary claims. The bank's participation in Schultz' adversary proceeding was anything but voluntary. In the end, I determined that Schultz made an invalid claim that the CSA contained a "scrivener's error" and concluded that the first annuity payment is due and payable one year after entry of the Final Judgment, not in October 1998 as Schultz had originally claimed in this adversary proceeding. Union Bank resisted Schultz' view on those issues and asserted in response what I determined to be Union Bank's invalid claim that its CSA obligation was only to provide an annuity contract purchased from an insurance company.

c. Even if Union Bank was entirely at fault on the matter of CSA interpretation or performance (which it clearly was not), excusing Schultz' performance under the

CSA would not be an appropriate remedy for the shortcomings in Union Bank's performance asserted by Schultz. Compensation in damages not only would have provided Schultz with an ample remedy, it would have provided Schultz with essentially (apart from the possibility of recovering Schultz' attorneys' fees and costs) all the recovery to which he was entitled under the CSA. Moreover, at best and in any event, the annuity payments would have been available to Schultz only in installments, commensurate with the installments payable under the CSA.

d. Nothing in the record suggests that Union Bank is either unable or unwilling to perform its installment obligation as directed by the CSA or a final order of this court. In fact, the record on this dispute suggests just the opposite—that the bank will perform once the matter is settled by the final decision in this matter.

e. While the parties have fought long and hard over their differences, and while Union Bank was found liable in the Final Judgment in the State Court Litigation for nearly $12 million in damages for fraud and violation of its obligation of good faith and fair dealing toward Mr. Schultz, the discharge and the terms of payment of that damage award have been settled voluntarily by the parties. The record supporting Schultz' allegations in this adversary proceeding provides no basis for me to conclude that Union Bank's behavior under the CSA, albeit arms' length, hard litigation, asking no quarter and giving none, does not conform to the requirements of good faith and fair dealing. The parties to this litigation concerning implementation of the CSA appear to be about equally represented by capable, tough-minded lawyers. Both sides have been tough. Neither seems to have asserted an altogether correct view of its respective CSA rights and obligations.

f. In addition, I conclude that to declare the CSA contract voided by reason of Union Bank's annuity tender would deprive the bank of a reasonable opportunity to cure any defect in its tender long before the bank's first payment becomes due under the CSA. I conclude that Schultz has not been discharged from his obligations to perform the executory provisions of the CSA by reason of any breach of the CSA, anticipatory or otherwise, by Union Bank.

### Schultz' Other Claims

8. Schultz' performance under the CSA is not excused or discharged by California Civil Code Sections 1439 or 1440, or otherwise.

9. Schultz has failed to state or establish an actionable claim for rescission of the CSA.

10. There was a meeting of the minds between the parties regarding monetary compensation to be paid to Schultz and on all other terms specifically dealt with in the CSA.

11. There is no triable issue of fact suggesting that Union Bank drafted the CSA so as to permit it to attempt later to deprive Schultz of the benefits of the CSA.

12. There was no failure of consideration by Union Bank in the execution and/or performance of the CSA.

13. Schultz is not entitled to rescind the CSA pursuant to California Civil Code sections 1689 or 1710.4 on the basis of unilateral mistake, mutual mistake, connivance, fraud in the inducement, rescission based on fraud, failure of consideration, or on any other basis.

14. There is no triable issue of fact suggesting that Union Bank interfered with Schultz' collection of the Tobias II Funds.

15. There is no triable issue of fact suggesting that Union Bank delayed Schultz' collection of the Tobias II Funds.

16. There is no triable issue of fact suggesting that Union Bank breached the CSA by continuing the State Court Litigation after the CSA was executed.

17. The allegations that Union Bank's State Court Litigation pre— and post-trial motions breached the CSA do not raise any triable issue of fact. Paragraph 3 of the CSA permitted such motions.

### Good Faith

18. Count Two of Schultz' Second Amended Complaint fails to state a viable claim for tortious breach of the implied covenant of good faith and fair dealing because Schultz has not alleged any "special relationship" with Union Bank in connection with the CSA. *Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 207 (9th Cir.1991).

19. Schultz has no "special relationship" with Union Bank relating to the CSA. The arms' length relationship between the parties is clearly established in Paragraph 12 of the CSA.

### The Tobias II Funds, The Fulton Judgment And Rescission Of The CSA

20. The Tobias II Funds and Fulton Judgment were not mentioned in the CSA. The CSA is silent with respect to the Tobias II Funds and any right to collect on the Fulton Judgment.

21. Schultz has failed to raise triable issues of fact as to Union Bank's alleged breach of the CSA based on or related to the Tobias II Funds and the Fulton Judgment.

22. The parties outlined the reasons for the CSA as follows:

WHEREAS, the parties desire to resolve by this Settlement Agreement the issue of the minimum and maximum amount Schultz can recover in this Action, and the Parties consider it to be in their best interests and to their mutual advantage to enter into this Agreement and to settle, adjust and compromise all such matters and all such existing or potential disputes, while giving the Parties the right to complete the litigation of the Action to a final conclusion.

WHEREAS, the purpose of this agreement is to provide Schultz a guaranteed payment and to limit Union Bank's maximum payment to Schultz, regardless of the ultimate final judgment in the Action.

23. The reference in the CSA to "Action" was intended only as a reference to the State Court Litigation; it was not intended in any way to refer to the Fulton Litigation.

24. As to the Fulton Judgment, the Tobias II Funds and the possibilities of rescission by Schultz, restitutionary damages to Schultz, and return consideration to Union Bank, the CSA is silent. I conclude that there is an ambiguity in the CSA as to the effect of Schultz' subsequent election to rescind the AISA. The parol evidence properly admissible to explain this ambiguity leads me to the conclusion that there was no meeting of the minds of the parties to the CSA concerning the effect and consequences of either (a) Schultz' later rescission of the AISA or (b) the State Court Judgment provisions regarding the effect of Schultz' election to rescind the AISA. The lack of a meeting of the minds of the parties on these subjects, while of considerable consequence to the parties, does not result in a total failure of consideration or the failure of the CSA to achieve status as an enforceable contract or as an integrated agreement. Rather, it leaves open one issue in the State Court Litigation: how to work out the AISA "rescission", "restitution", and "return consideration" issues without affecting the CSA "maximum payment to Schultz"

agreement. I have expressed in these findings and conclusions my views on the subject, but based on the pleadings and the evidence, I do not believe I have the authority properly to impose my views on either party without that party's voluntary consent. If the parties are not able to work out a resolution of the AISA rescission, Fulton Judgment, Tobias II Funds issues between themselves, the parties will have to return to the State Court to pursue a litigated resolution. Meanwhile, I am required to give full faith and credit to the Final Judgment in the State Court Litigation. 28 U.S.C. § 1738. It clearly seems that the Final Judgment has resolved those issues.

### The $400,000 Note And Deed Of Trust

25. The issue of the $400,000 note, while nowhere dealt with in the CSA, is rendered moot by the Final Judgment which did not disturb those parts of the Interim Statement of Decision, Final Decision and Judgment in the State Court Litigation offsetting the $400,000 note against compensatory damages awarded Schultz. Union Bank has delivered to Schultz a deed of reconveyance and has canceled the $400,000 note.

Any of the foregoing conclusions that more appropriately should be treated as a finding of fact hereby is incorporated by reference in the foregoing findings of fact.

### Prevailing Party

The issue of which party is the "prevailing party" for purposes of an award of attorneys' fees, or, indeed, whether either party prevailed, is reserved for later hearing upon further pleadings to be filed.

### Conclusion

Based on the court's rulings set forth above, there is no triable issue of material fact with respect to any cause of action asserted by Schultz.

Schultz' motion for summary adjudication is granted as to Schultz' First Cause of Action only; Union Bank is obliged to make, and remains responsible to Schultz for, the annuity payments specified in paragraph 2(a) of the CSA. Schultz' motion for summary adjudication is denied as to all other issues.

Union Bank's motion for summary adjudication is denied as to Union Bank's assertion that it is not obliged to remain responsible for the annuity payments pursuant to the CSA. Union Bank's motion for summary adjudication is granted as to all other issues raised in Schultz' First Cause of Action, Second Cause of Action, and Third Cause of Action. Union Bank's motion for summary judgment is denied.

Schultz' Second Amended Complaint therefore shall be ordered dismissed with prejudice except as to Union Bank's obligation to make or remain responsible for the annuity payments pursuant to paragraph 2(a) of the CSA. As to the latter, Schultz shall be granted summary judgment against Union Bank.