**In re AMP'D MOBILE, INC., Debtor.**

**Amp'd Mobile, Inc., Plaintiff,**

**v.**

**Peter Adderton, Defendant.**

**Peter Adderton, Third–Party Plaintiff,**

**v.**

**Matthew Newton, Patrick Dunn, Marinus N. Henny, Jon Auerbach, Rajeev Narang, Allen Beasley, John Donovan, and Edward Kingman, Third–Party Defendants.**

**Bankruptcy No. 07–10739(BLS).
Adversary No. 08–50269(BLS).**

United States Bankruptcy Court, D. Delaware.

April 16, 2009.

Steven M. Yoder, Esquire, Potter Anderson & Corroon LLP, Wilmington, DE, for Amp'd Mobile, Inc.

Jeffrey C. Wisler, Esquire, Connolly Bove Lodge & Hutz LLP, Wilmington, DE, for Peter Adderton.

Mark Daniel Olivere, Esquire, Landis Rath & Cobb LLP, Wilmington, DE, for Matthew Newton, Patrick Dunn, Jon Auerback, Rejeev Narang, Allen Beasley, and John Donovan.

Paul D. Brown, Esquire, Edwards Angell Palmer & Dodge, LLP, Wilmington, DE, for Matthew Newton, Patrick Dunn, Jon Auerback, Rejeev Narang, Allen Beasley, and John Donovan.

Joanne P. Pinckney, Esquire, Pinckney, Harris & Weidinger, LLC, Wilmington, DE, for Marinus N. Henny and Edward Kingman.

## *OPINION* [1]

BRENDAN LINEHAN SHANNON, Bankruptcy Judge.

Before the Court is the motion to dismiss (the "Motion") [Docket No. 102] filed by third-party defendants Matthew Newton, Patrick Dunn, Jon Auerbach, Rajeev Narang, Allen Beasley, and John Donovan (hereinafter collectively referred to as the

---

1. "The court is not required to state findings or conclusions when ruling on a motion under Rule 12...." Fed. R. Bankr.P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

"Third–Party Defendants") seeking dismissal of the third-party complaint (the "Third–Party Complaint") filed against them by Peter Adderton, the sole defendant in this adversary proceeding (the "Defendant" or "Adderton"). The Motion has been joined by third-party defendants Marinus N. Henny and Edward Kingman [Docket No. 106]. For the following reasons, the Court will grant the Motion.

## I. *BACKGROUND*

The plaintiff in this adversary proceeding, Amp'd Mobile, Inc. (the "Plaintiff" or "Amp'd"), formerly engaged in the business of operating a mobile phone and entertainment service that primarily targeted younger customers between the ages of eighteen and thirty. Amp'd distinguished itself from its competitors by offering a broader range of media content for download onto their customer's mobile handsets than was generally available at the time, including music, games, video, and on-demand live streaming content. Adderton was the founder of Amp'd, and also served as a director and the CEO of the company.

On May 2, 2007, Amp'd and Adderton entered into an employment and release agreement (the "Release Agreement") for the purpose of ending Adderton's tenure as CEO and transitioning him to a different role with the company. The Release Agreement provided Adderton with severance and incentive payments, a stock redemption agreement that called for Adderton to sell 100,000 of his nearly 1 million shares in Amp'd to the company for $7 per share, and other benefits. The Release Agreement was subsequently approved by Amp'd's board of directors, with Adderton abstaining. Adderton then stepped down as CEO, and the stock redemption proceeded under the terms of the Release Agreement. On or about May 2, 2007, Adderton transferred 100,000 shares of

stock to Amp'd, and received $700,000 in return. Adderton also subsequently received the severance payment contemplated by the Release Agreement.

Amp'd filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code") on June 1, 2007, less than a month after Adderton stepped down as CEO. Amp'd announced at the outset of its bankruptcy proceedings that its twin goals were to stabilize its relationships with certain critical service suppliers and to obtain financing sufficient to permit it to reorganize. Amp'd was unable to obtain new financing and terminated services to its customers on August 2, 2007, after a brief but unsuccessful effort to sell itself as a going concern.

Amp'd commenced this adversary proceeding on February 1, 2008 by filing a complaint (the "Complaint") against Adderton, seeking disallowance of his claim and the avoidance and recovery of several purportedly fraudulent transfers stemming from the Release Agreement. Adderton filed an answer to the Complaint on March 18, 2008. Amp'd then filed an amended complaint (the "Amended Complaint") on June 16, 2008. In addition to the remedies originally sought, the Amended Complaint added new causes of action for preference liability and unjust enrichment, and also alleged that Adderton is liable under 8 Del. C. § 160 because Adderton redeemed his stock at a time when the Plaintiff's capital was impaired (the "Delaware Corporate Law Claim").

On June 25, 2008, Adderton filed an answer to the Amended Complaint. Shortly thereafter, Adderton sought leave to amend his answer for the purpose of asserting claims against the directors of Amp'd who authorized the stock redemption that served as the basis for the Delaware Corporate Law Claim. Adderton contended that, under 8 Del. C. § 174, he

would be entitled to contribution from these directors if Amp'd is ultimately successful in asserting the Delaware Corporate Law Claim against him.

Amp'd responded on September 19, 2008 by seeking leave to dismiss its Delaware Corporate Law Claim. At that time, Amp'd also opposed Adderton's motion for leave to file his Third–Party Complaint. One week later, the Defendant filed an opposition to Amp'd's motion for leave to dismiss, contending that he would suffer "plain legal prejudice" if Amp'd were permitted to dismiss the Delaware Corporate Law Claim. More specifically, Adderton argued that dismissal of that claim would deprive him of his claim for contribution against Amp'd's directors, making dismissal improper under Federal Rule of Civil Procedure 41(a)(2).

Following oral argument on Amp'd's motion for leave to dismiss the Delaware Corporate Law Claim and Adderton's motion for leave to file his Third–Party Complaint, the Court issued a written opinion [Docket No. 87] denying Amp'd's motion and granting Adderton's motion on October 24, 2008. The Court's opinion noted that it was not clear if there was any meaningful prospect for recovery by Adderton on the contribution claims advanced by him in what is now the Third–Party Complaint, but nevertheless concluded that it was not appropriate to foreclose this possibility in the context of the motions before the Court at that time. (Opinion at 121–22.)

Following the Court's opinion, Adderton filed the Third–Party Complaint on November 7, 2008. It asserts three causes of action against the Third–Party Defendants: (i) a claim for equitable contribution and subrogation; (ii) a claim for statutory contribution under 8 Del. C. § 174(b); and (iii) a claim for declaratory relief.

The Third–Party Defendants filed the instant Motion on January 16, 2009. The Motion contends that a general release of claims, contained in the Release Agreement signed by Adderton, bars each of Adderton's claims against the Third–Party Defendants. The Motion also claims that (i) Delaware does not recognize equitable contribution or equitable subordination as causes of action; (ii) Adderton has no statutory right to contribution from the Third–Party Defendants; and (iii) that Adderton's declaratory relief claim is simply duplicative of his other claims. In response, Adderton challenges the enforceability of the general release in the Release Agreement, and makes a number of legal arguments in support of his particular claims.

This matter has been fully briefed and is ripe for decision.

## II. *JURISDICTION AND VENUE*

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (H) and (O).

## III. *STANDARD OF REVIEW*

The Third–Party Defendants seek dismissal of all three counts in the Third–Party Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides for dismissal for "failure to state a claim upon which relief can be granted."

The courts determined long ago that a motion to dismiss pursuant to 12(b)(6) "tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). For nearly 50 years, courts applied a liberal standard when determining whether

the factual allegations made in a complaint were sufficient to withstand a 12(b)(6) motion. Taking their cue from the Supreme Court's ruling in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), most courts found that a count in a complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45–46, 78 S.Ct. 99.

A recent United States Supreme Court case, however, altered the analysis courts apply under 12(b)(6). In *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court did away with this "no set of facts" standard, stating in no uncertain terms that this language "has earned its retirement." *Twombly*, 127 S.Ct. at 1969. In fact, the Court inferred that this language had been improperly applied all along by stating that it "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.*

The *Twombly* Court also explained that a plaintiff must "nudge [his or her] claims across the line from conceivable to plausible" in order to survive a motion to dismiss. *Twombly*, 127 S.Ct. at 1974. This language has been read as imposing a new "plausibility" requirement at the pleading stage of all cases by a number of courts, including the U.S. Court of Appeals for the Third Circuit. *See Phillips v. County of Allegheny*, 515 F.3d 224, 234 ("[W]e decline at this point to read *Twombly* so narrowly as to limit its holding on plausibility to the antitrust context.").

The Third Circuit has explained that this plausibility requirement "is related to the requirement of a Rule 8 'showing.'" *Id.* According to the Third Circuit, "a 'showing' requires only notice of a claim and its grounds," and the *Twombly* Court "distinguished such a showing from 'a pleader's "bare averment that he wants relief and is entitled to it." ' " *Id.* (citing *Twombly*, 127 S.Ct. at 1965 n. 3). Thus, the Third Circuit has concluded that "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable,' [but] the '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Id.* (citing *Twombly*, 127 S.Ct. at 1965).

As noted by the Third Circuit in *Phillips*, however, the Supreme Court appears to have left the remainder of 12(b)(6) jurisprudence intact. *Twombly* reaffirmed that Federal Rule of Civil Procedure 8 " 'requires only a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests,' " and that this standard does not require "detailed factual allegations." *Twombly*, 127 S.Ct. at 1964. Twombly "also reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips*, 515 F.3d at 231 (citing *Twombly*, 127 S.Ct. at 1964–65, 1969 n. 8). Additionally, while Twombly did not address whether all reasonable inferences should continue to be drawn in favor of plaintiffs subjected to 12(b)(6) motions, the Third Circuit has held that nothing in Twombly changes this long-established practice. *Id.* Moreover, it should be noted that the *Twombly* Court repeatedly stressed that it was neither demanding a heightened pleading of specifics, nor im-

posing a "probability requirement." *Twombly*, 127 S.Ct. at 1964–65, 1969 n. 8.

The Third Circuit has summarized the *Twombly* Court's formulation of the pleading standard as follows:

> "[S]tating ... a claim requires a complaint with enough factual matter (taken as true) to suggest" the required element. This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.

*Phillips*, 515 F.3d at 234 (internal citations omitted). This standard will, of course, govern the Motion in this case.

## IV. DISCUSSION

■ As a threshold matter, the Court notes that it may consider exhibits attached to a complaint whose authenticity is unquestioned when considering a motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1195 (3d Cir.1993) (noting that a court considering a motion to dismiss may consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record"). In this case, a copy of the Release Agreement executed by Amp'd and Adderton is attached as Exhibit 1 to Adderton's Third–Party Complaint. Accordingly, the Court can consider this document, which by its

terms is governed by California law, in evaluating whether the Third–Party Complaint should be dismissed.

■ With this in mind, the Court turns to the question of whether the Release Agreement bars Adderton from asserting his claims for statutory contribution and equitable contribution and/or subordination.[2] The Release Agreement executed by Adderton provides Amp'd and "its current and former officers, directors, employees, agents, investors, attorneys, shareholders, administrators, affiliates, divisions, and subsidiaries, and predecessor and successor corporations and assigns" with a general release that is broadly written. (Release Agreement at ¶ 5). The release covers "any claim, complaint, charge, duty, obligation, or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected" that Adderton may possess against the parties released under the agreement "arising from any omission, acts, facts, or damages that have occurred up until and including the Effective Date" of the Release Agreement. (*Id.*).[3] Under the terms of the Release Agreement, the "Effective Date" of the Release Agreement was the eighth day after Adderton signed it. (*Id.* at ¶ 12). Adderton signed the Release Agreement on May 2, 2007, so the "Effective Date" was May 10, 2007.[4] The effect of this is that Adderton gave the

---

**2.** There is a dispute between the parties over whether Delaware law recognizes claims for equitable contribution and equitable subordination. The Court assumes, solely for sake of argument, that Delaware law would recognize such claims on the terms advanced by Adderton in his briefs.

**3.** The Release Agreement also provides for release of a number of more specific claims, without limitation as to the effectiveness of the general release. These include any and all claims relating to or arising from Adderton's relinquishment of his role as CEO of

Amp'd, and any claim for attorney's fees and costs. (*Id.* at ¶ 12).

**4.** The Third–Party Complaint alleges that the Release Agreement was executed on or about May 4, 2007. The copy of the Release Agreement attached to the Third–Party Complaint clearly shows that it was signed and dated on May 2, 2007, however. In any event, though, whether the Agreement was executed on May 2 or May 4 does not bear upon the outcome of the Court's ruling.

Third–Party Defendants and other releasees a complete and general release of all claims he had against them based on anything they did or failed to do prior to midnight on May 10, 2007.

Because Adderton redeemed his stock and received consideration for the redemption on May 2, 2007, any contribution or subrogation claim arising from this stock redemption would have arisen before the "Effective Date" of the Release Agreement, and thus would be within the temporal scope of the release.[5]

The question thus becomes whether Adderton's claims against the Third–Party Defendants are precluded under the terms of the Release Agreement. Although Adderton argues otherwise, the Court finds that the Release Agreement is not ambiguous or "reasonably susceptible" to multiple interpretations. *See Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 (1968) (holding that, under California law, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible"). The clear language of the release provides a complete, general release in favor of the Third–Party Defendants and others that includes contribution and subrogation claims. The only limitations on the release are "claims that cannot be released as a matter of law" and "obligations incurred under" the Release Agreement it-

self. The law does not prevent the release of the type of claims asserted by Adderton, and Adderton's claims for contribution and subrogation were not incurred by Amp'd under the Release Agreement.[6] The Release Agreement, if enforced as written, would clearly prohibit Adderton from bringing these claims.

 Adderton argues in the alternative that the instant Release Agreement will not be supported by consideration if Amp'd is successful in recovering the consideration paid to Adderton under the terms of the Release Agreement in this lawsuit. *See, e.g., Holcomb v. Long Beach Inv. Co.*, 129 Cal.App. 285, 296–97, 19 P.2d 31 (1933) (noting California law requires consideration to make a written release enforceable). In the present dispute, there are five ways Amp'd could recover from Adderton. Whether Adderton will retain consideration after a successful recovery by Amp'd depends on which of these causes of action Amp'd recovers on. But, as demonstrated below, any recovery based on the causes of action asserted in Amp'd's Amended Complaint arising from Adderton's stock redemption will result in either (i) Adderton retaining consideration such that the Release Agreement is enforceable, or (ii) Amp'd recovering on a theory that, as a matter of law, does not allow for a consequent contribution or subordination claim.

 First, if Amp'd recovers from Adderton on one of the several fraudulent conveyance theories advanced in the Amended Complaint, Amp'd will have effected a rescission of the Release Agree-

---

5. Severance payments made to Adderton after this date, however, are not within the scope of the Release Agreement or this Opinion.

6. Putting aside the issue of whether the Third–Party Defendants could incur an enforceable obligation under the Release Agree-

ment when they were not parties to it, the Court concludes that claims for contribution and subordination such as Adderton's would arise as a matter of law, not under a contract such as the Release Agreement executed in this case.

ment. *See Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir.2006), cert, denied, 549 U.S. 1114, 127 S.Ct. 962, 166 L.Ed.2d 707 (2007) ("[t]he proper remedy in a fraudulent conveyance claim is to rescind, or set aside, the allegedly fraudulent transfer, and cause the transferee to return the transferred property to the transferor."). After such a recovery, Adderton would be correct to argue that there is no consideration to support the release he signed—in fact, there would have already ceased to be such a release because it would have been rescinded. But, if Amp'd recovers through this method, Adderton could not assert a claim for contribution or subrogation against the Third–Party Defendants because there is no damage award to get contribution toward,[7] and because one cannot be subrogated to a recovery resulting from such a rescission. Thus, there can be no contribution or subordination claim, equitable or statutory, following recovery on a fraudulent conveyance claim.

Second, there can be no contribution or subordination right resulting from a recovery by Amp'd in the form of a disallowance of claim. If Adderton's claim is disallowed, there is no monetary judgment another can be forced to contribute toward, or subrogated to recover from another. Moreover, if Amp'd's only successful cause of action against Adderton is for disallowance of a claim, then Adderton will have retained consideration under the Release Agreement and the general release would preclude Adderton from asserting any contribution or subordination claim against the Third–Party Defendants.

Third, a recovery based on an unjust enrichment theory could, theoretically, dispossess Adderton of all consideration received under the Release Agreement. This would render the general release signed by him null and void, and thus allow him to assert a contribution claim against others who were also unjustly enriched by the act that unjustly enriched Adderton (or, if Adderton was secondarily unjustly enriched and another person was primarily unjustly enriched, a subrogation claim). The facts pled by Adderton in the Third–Party Complaint, however, foreclose any such possibility in this case. Taken as true, the allegations in the Third–Party Complaint show that Adderton was the only party who could conceivably be found to have been unjustly enriched under the Release Agreement. Therefore, no contribution or subrogation claim can arise if Amp'd recovers from Adderton on an unjust enrichment theory.

Fourth, if Amp'd recovered from Adderton on a preference theory, then Adderton

---

7. Though some authorities may speak colloquially of recovering "damages" for a fraudulent transfer, such a description is inaccurate. As noted recently by the United States Court of Appeals for the Second Circuit, a creditor's remedies in a fraudulent conveyance action are "limited to reaching the property which would have been available to satisfy the [debtor's obligations] had there been no conveyance, and requiring that it be restored to the debtor's possession." *Grace*, 443 F.3d at 189 (quoting *Geren v. Quantum Chem. Corp.*, 832 F.Supp. 728, 736–37 (S.D.N.Y.1993)). Or, put another way, the "purpose of such an action is to force the debtor to recover property transferred for inadequate consideration so that the property can be used to satisfy the debt owed to the creditor." *Id.* At bottom, recovering a fraudulent transfer simply gives the debtor its property back (or, in some cases, the value of that property). The fact that the recovered property may sometimes be money, as here, does not transmute the recovery into an award of money damages. Once an agreement to transfer money or other property is rescinded on the grounds that it constitutes a fraudulent transfer, the property or money to be recovered ceases to belong to the returning transferee; it becomes the debtor's property once again. Having one's own property returned is fundamentally different than receiving a damages award.

still will have retained sufficient consideration under the Release Agreement for the release to be enforceable and bar any contribution or subrogation claim against the Third–Party Defendants. This is the case because, in addition to other consideration Adderton may have received and kept under the Release Agreement, a transferee from whom a preferential payment is recovered is entitled to file a claim arising from the recovery pursuant to section 502(h) of the Code. *See In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 466 (Bankr.S.D.N.Y.2007). Put another way, if Amp'd recovers from Adderton on a preferential transfer theory, Adderton will be entitled to prosecute claims against Amp'd on account of the avoided transfer. Therefore, Adderton will still retain consideration under the Release Agreement, and as a result there would not be a failure of consideration that invalidates the release.

Finally, Adderton cannot bring a contribution or subordination claim, either equitable or statutory, based on the Delaware Corporate Law Claim. Adderton received consideration under the Release Agreement apart from the consideration given to him for his stock redemption (and apart from that which Amp'd seeks to recover from Adderton in this litigation). Therefore, if Amp'd succeeds against Adderton on the basis of the Delaware Corporate Law Claim, there will still be consideration for the general release, and the general release will bar Adderton's contribution claims. Moreover, if it is shown that Adderton had knowledge that his redemption was unlawful at the time he received payment, then he is primarily liable to the directors, who are subordinated to the rights of Amp'd to recover the proceeds of the improper redemption from Adderton, and contribution becomes a moot point. *See* 8 Del, C. § 174(c) (requiring "knowledge of facts indicating that such dividend, stock purchase or redemption was unlawful" in order for shareholder receiving such to be liable to either the corporation or, derivatively, the directors who authorized the transaction and recompensed the corporation for the loss). This is because the Directors who would have to pay Adderton in contribution would be allowed to recover anything paid to him in contribution from Adderton after being subrogated to the rights of the corporation against Adderton. These amounts would be setoff against each other and Adderton would receive nothing.[8]

8. This very curious situation results because of Adderton's role as both a director and a redeeming shareholder of Amp'd. Section 174 makes any director who willfully or negligently authorizes an improper redemption jointly and severally liable to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount unlawfully paid for the redemption of the corporation's stock. 8 Del. C. § 174(a). As noted by Adderton, however, section 174(b) provides that "[a]ny director against whom a claim is successfully asserted under this section shall be entitled to contribution from the other directors who voted for or concurred in the unlawful ... stock redemption." 8 Del. C. § 174(b).

Section 174(c), meanwhile, provides that: [a]ny director against whom a claim is successfully asserted under this section shall be entitled, to the extent of the amount paid by such director as a result of such claim, to be subrogated to the rights of the corporation against stockholders who received the [consideration for the redemption of their stock] with knowledge of facts indicating that such [stock redemption] was unlawful under this chapter, in proportion to the amounts received by such stockholders respectively.

8 Del. C. § 174(c). Clearly, any contribution paid by the Third–Party Defendants to Adderton would be "amount paid by such director as a result of" a contribution claim, and thus would be subrogated to the rights of the corporation to recover from Adderton if, as noted above, Adderton had knowledge that his redemption was unlawful. The law of setoff would make such contribution a futile exercise.

The Court also notes that Amp'd previously moved for leave to dismiss the underlying Delaware Corporate Law Claim, which motion the Court denied without prejudice in order to explore Adderton's contribution claims on the merits. Now, with Adderton having had the opportunity to at least plead his contribution claims, and the Court having considered the matter on a more fully developed record, the Court deems dismissal of the Delaware Corporate Law Claim appropriate at this time.

To recap, if Amp'd recovers from Adderton, one of two situations will result: either (i) the remedy awarded to Amp'd will not allow Adderton to assert a claim for contribution as a matter of law because there can be no contribution toward such a remedy, or (ii) in each instance where a contribution claim would otherwise be permitted, the contribution claim will be barred in this instance by the Release Agreement. Accordingly, there is no possible recovery by Amp'd in this case that would allow Adderton to assert a claim for contribution or subordination against the Third–Party Defendants based on the facts pled in the Third–Party Complaint and the causes of action pled by Amp'd. Therefore, Adderton's claim for statutory contribution under 8 Del. C. § 174 and his claim for equitable contribution and/or equitable subrogation both fail to state a claim for relief that can be granted and are hereby dismissed.[9]

## V. CONCLUSION

For the foregoing reasons, the Court finds that Adderton's claims against the Third–Party Defendants are precluded by the Release Agreement. Accordingly, the Court will grant the Motion.

An appropriate order follows.

## ORDER

AND NOW, this **16th** day of **APRIL, 2009,** upon consideration of the motion (the "Motion") [Docket No. 102] of third-party defendants Matthew Newton, Patrick Dunn, Jon Auerbach, Rajeev Narang, Allen Beasley, and John Donovan (hereinafter collectively referred to as the "Third–Party Defendants") to dismiss the third-party complaint, the joinder [Docket No. 106] of third-party defendants Marinus N. Henny and Edward Kingman, and the objection [Docket No. 108] of third-party plaintiff Peter Adderton; for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Motion is **GRANTED;** and it is

**FURTHER ORDERED** that Amp'd Mobile is granted leave to dismiss its claim against Peter Adderton for violation of 8 Del. C. § 160 [Count No. VII] from its amended complaint.

---

**9.** Adderton also seeks a "judicial determination of his rights and obligations, and a declaration that the [Third–Party Defendants] are liable in contribution and/or subrogation for the amount of any judgment against Adderton related to the Stock Redemption." The Court views this declaratory relief claim as wholly duplicative of Adderton's first two claims and finds dismissal is therefore warranted. *See In re Am. Bus. Fin. Serv., Inc.,* 362 B.R. 149, 166 (Bankr.D.Del.2007).